MARY ELIZABETH WILKIE, formerly MARY ELIZABETH ROBERTS *v.* JOHN F. COLLINS.

1. EVIDENCE—PRESUMPTIONS.—The law presumes every individual to be innocent of crime and to conform his conduct to the requirements of duty, as prescribed by law.

2. DOMESTIC RELATIONS—MARRIAGE—PRESUMPTIONS.—Society rests upon marriage, the law favors it, and when a man and woman have contracted marriage in due form, the law will require clear proof to remove the presumption that the contract is legal and valid.

3. PRESUMPTION OF DEATH, WHEN INDULGED IN FAVOR OF THE VALIDITY OF A SECOND MARRIAGE.—A husband left his home in Mississippi, October 30, 1859, and went to Louisiana, on business, where he was last heard from by letter to his wife, November 30, 1859, announcing that he was then sick in bed, and would return as soon as able to travel. He was of habitual delicate health, and his domestic relations had always been most agreeable. It was the belief of his family that he was dead, and on 22d December, 1861, his wife married again. The absent husband was never heard of alive. *Held,* that under the circumstances, the absent husband must be presumed dead, and that the second marriage is valid.

APPEAL from the chancery court of Yalobusha county. STEARNS, Chancellor.

The record discloses the following facts:

Appellant married one Napoleon Roberts, on the 4th October, 1859. About the 30th October, 1859, Roberts left his home in this state and went to Louisiana on business. Several letters were received from him, the last about the 30th November, 1859. He was then in

Louisiana, sick in bed, and announced that he had con-
cluded his business and would return home as soon as
able to travel.   His domestic relations were affection-
ate and agreeable.   He has never been heard of since.
It was the belief of his family, when appellant married
Wilkie, and is their belief now, that Roberts died in
Louisiana in the latter part of 1859.

Appellant married Sylvester Wilkie, 22d December,
1861.   Left him in the fall of 1868 and went to
Arkansas.

Wilkie married Mary Eliza Adams, 1869, and died
6th September, 1871.

On the 12th September, 1871, the clerk of the chan-
cery court of Yalobusha county, in vacation, granted
letters of administration on Wilkie's estate to appellee.
At the ensuing October, 1871, term of the chancery
court, the clerk moved the court to confirm his action
in vacation, and at the same time appellant appeared
and moved the court to set aside and vacate the action
of the clerk, and to grant letters of administration to
her.   On the application of appellee, the matter was
continued to the following term, in January, 1872,
when the court confirmed the action of the clerk.   And
from this decision of the court appellant appealed.

The controversy originated from the doubt of the
validity of appellant's marriage with Wilkie.

*Walthall & Golladay*, for appellant.

I. Every presumption must be indulged in favor of
a marriage solemnized according to the forms of law.
Ward v. Dulaney, 23 Miss. 415; Hull v. Rawls, 27 ib.
471, 473 ; Powell v. Powell, ib. 783, 784.

These cases are pertinent in more aspects than one.

There is a presumption of the continuation of life ;
there is also a presumption of innocence.   The former
yields to the latter when these conflict.   Spears v.
Burton, 31 Miss. 546; Rex v. Twyning, 2 B. & Ald.;

Greensboro v. Underhill, 12 Vt. 604; Yates v. Houston, 3 Tex.; Canady v. Gorge, 6 Rich. Eq. (S. C.) 103; 1 Greenl. Ev., §§ 35, 41; Best on Ev. (5th Lon. ed. 1870), §§ 334, 335; Cloydon v. Wardell, 4 N. Y. 230.

The authorities last cited maintain the validity of a marriage within the five or seven years from the time the absentee was last heard from, if it be not proved that such absentee was, in fact, living at the time of the marriage. This proposition was clearly announced in the sixth instruction to the jury by the distinguished judge who presided in the lower court, in Spears v. Burton; and this court, speaking of that and another instruction: "We consider these instructions as stating the correct rule upon the subject. It is true, that the presumption of law that Bayard was alive until the lapse of five years after his departure has given rise to the presumption created by the statute, that e was dead. But there is also a presumption of law th ; the marriage of the plaintiff's father and mother w ' valid, it having been solemnized in due form of la It was valid, unless the former husband was living a that time. But unless he was shown to be living, t presumption must be indulged that he was dead; be- cause, otherwise, the second marriage would be held criminal by reason of a presumption which would be to establish a crime upon a bare presumption." 31 Miss. 555.

Manifestly, this presumption of innocence is inap- plicable, except to such a case as that of appellant, where the marriage was solemnized before the expira- tion of five years from the time Roberts was proved to be living. For, had Roberts been absent five successive years before appellant married Wilkie, without being known to her, within the time, to be living (Rev. Code, 1857, 577, art. 29), her marriage with Wilkie would not have been criminal and punishable. Proof, indeed, that Roberts was living when she married Wilkie

would avoid that marriage.    Gibson v. the State, 38 Miss. 322.

But, from the time appellant heard from Roberts, to the time she married Wilkie, five years not having expired, the statutory presumption of death does not attach; and, unless the presumption in favor of innocence is applied, she committed bigamy, and can be punished on the presumption that Roberts was living when she married Wilkie, it not being proved that Roberts was then dead.

On authority, therefore, it seems clear that a presumption of death arises whether the marriage occurred before or after the expiration of five years from the time the absentee was proved to be living, such absentee not being proved to be living at the time of the marriage; and the only difference between a marriage before and one after five years is—the absentee being proved to be living when it was solemnized—in the former case the marriage is criminally bigamous, in the latter it is not.    Gibson v. the State, 38 Miss.; Spears v. Burton, 31 ib.

It was urged in the lower court, by counsel for appellee, that the presumption of innocence invoked to support the validity of the marriage of Wilkie and appellant, applied as well to the marriage of Wilkie and the woman Mary Eliza Adams; and apparently this conceit had much weight with the chancellor, for the only reason that functionary assigned for sustaining the grant (by the clerk, in vacation) of letters of administration to appellee, was, it appeared to him, that the presumptions of innocence were about equal to the presumptions of guilt.    The position asserted in behalf of appellant, briefly stated, is, if Roberts was living when she married Wilkie, and that fact is proved, her marriage with Wilkie was void, and the marriage of Wilkie and the woman Mary Eliza was valid; but if Roberts is not proved to have been living when she

married Wilkie, that marriage is presumed to be valid, and that presumption must be destroyed by proof, or Wilkie's marriage with the woman Mary Eliza must be deemed void. Were it not proved that appellant was living when Wilkie contracted the second marriage, the presumption would then indeed be in favor of the validity of the second marriage. But the application, under the circumstances, of the presumption to the marriage of Wilkie and the woman Mary Eliza, involves the absurdity of sustaining the validity of two co-existing matrimonial connections.

2. There is a presumption of the continuanc of life unless the contrary is proved, or sufficient time has elapsed to raise the presumption of death. 1 Greenl. Ev., § 41.

In Mississippi a presumption of death arises sooner in some cases than others. Rev. Code, 1871, §§ 882, 2506; Gibson v. the State, 38 Miss.

The extent of the presumption of death is, that after the lapse of a definite time the absent and unheard of person is dead; but not that such person died at the end of the time at which the presumption arises, or at any particular time, and a jury may find the fact of death from the lapse of a shorter period, if other circumstances concur. Best on Presump. Ev. (5th Lon. ed., 1870), § 409; 1 Greenl. Ev., § 41; Smith v. Knowlton, 11 N. H. 191, 197; 1 Barb. Ch. 462.

" The jury may find, as a matter of fact, that a party died within a much less period after he was last heard from, on circumstantial evidence which leads their minds to such a conclusion." Parker, C. J., in 11 N. H. 197.

In this case the presumption is that Roberts died " long ago." Starting with the fact that Roberts is dead, the inquiry is, when, most probably, did he die? The testimony satisfactorily points to the latter part of 1859. He was then in the state of Louisiana,

whither he had temporarily gone on business; was confined to bed in feeble health; announced his purpose to return to his home and family in this state as soon as able; his domestic relations affectionate and pleasant, and therefore well calculated to induce his early return. He has never been heard of since. Those interested in him so deeply, believed and believe that he is dead. The facts, if not stronger, are strikingly like those in Spears v. Burton, before cited.

3. This presumption of innocence is applicable alike to civil and criminal cases. Rex v. Twyning, 2 B. & Ald.; Spears v. Burton, 31 Miss., is an ejectment suit. Clayton v. Wardell, 4 N. Y. 231, 237; Best on Presump. Ev. (5th London ed., 1870), § 334.

" The presumption of innocence is favored in law. This is a well known rule, and runs through the whole criminal law; but it likewise holds in civil proceedings." Best on Presump. Ev., § 334.

And then against this is opposed the strong legal presumption against the commission of crime; a presumption applicable in every case, as well civil as criminal." Clayton v. Wardell, 4 N. Y. 231, 237.

Should it be argued that the presumption, on which depends the validity of appellant's marriage with Wilkie, merely relieves her of a penalty and did not bind Wilkie, that position is refuted in Gibson v. the State, 38 Miss. 322–3.

*Mayes & McNeill*, for appellee.

It is admitted that on the 4th day of February, 1859, the appellant was married to one Napoleon Roberts; that in October, 1859, he left her, saying he was going to Louisiana on business, and would shortly return; but that he never returned, and, save by a few letters received from him soon after his departure, has never been heard from; that, without a divorce, appellant married the decedent on the 30th day of November,

1861, about two years after the disappearance of Roberts; that in the fall of 1868 appellant deserted the decedent, without informing him of her intention, and took up her abode in the state of Arkansas with a daughter of her's, remaining there until after the decedent's death; that decedent, after appellant's desertion of him, on the 11th day of September, 1869, married one Mary Eliza Adams, who is the person claimed by appellee to be the true widow; that appellant knew of this marriage, and made no objection to it either to the decedent or to said Mary Eliza, or to any of appellant's own relatives, who resided in Yalabusha county.

Such are the circumstances, and the only question involved in the cause is, which is the legal marriage?

The principle which controls this case may be gathered from 1 Greenl. Ev., § 41, and the Rev. Code of 1857, page 521, art. 252. A person once shown to be alive, is, for seven years presumed to be still alive, unless the contrary is shown, and this presumption is so strong, that "the burden of proof lies on the party who asserts the death." Throgmorton v. Walton, 2 Roll. 461; Wilson v. Hodges, 2 East, 313; Battin v. Bigelow, 1 Pet. C. C. R., 452; Gilliland v. Martin, 3 McLean, 490; 1 Greenl. Ev., § 41.

Counsel for the appellant maintain that this principle is overridden, and the burden of proving Roberts' death affirmatively is devolved on the appellee, by the presumption which, they say, the law will entertain of the innocence and validity of the appellant's marriage with the decedent. They cite as authorities to this point, 1 Greenl. Ev., § 35; 2 Am. Lead. Cas. 702–6; Hull v. Rawle, 27 Miss. 471; Spears v. Burton, 31 ib. 547; Gibson v. the State, 38 ib. 313. Generally, these authorities are not applicable to the case at bar, for the reason that they adjudicate causes which differ from this in an essential point, viz.: the fact that there

is not in them what is here, a counter presumption of innocence. True, the appellant is entitled to be held by this court innocent of bigamy ; and did the case rest here, the presumption of Roberts' continuation in life at the period of her marriage to Wilkie should be overthrown; but the case does not rest here, for Mary Eliza Wilkie, as well as the decedent himself, is entitled to a presumption of innocence as strong as appellant's, and the latter presumption will nullify the former.

Appellant's counsel will object, however, that Mary Eliza Wilkie is entitled to no presumption of innocence, "because," say they, "we produce the appellant in person ; her existence is an undoubted fact, and in the face of it, said Mary Eliza cannot invoke a presumption, nor can the appellee for her. Let them produce Roberts alive, to invalidate appellant's marriage, as we produce the appellant alive to invalidate the marriage of Mary Eliza Wilkie." This is a plausible objection, and would be sound if only the validity of Mary Eliza Wilkie's marriage to decedent depended on appellant's life or death, as that of the appellant to decedent does on the life or death of Roberts. Such, however, is not the case. The presumption of Mary Eliza Wilkie's innocence rests on neither the life nor death of this appellant, and, therefore, cannot be settled by the bodily presence of the appellant, but does rest solely on the precise point which the presumption of the innocence of the appellant herself raises, *i. e.*, the life or death of Roberts, which question, it is evident, will hardly be decided by the bodily presence of Roberts' wife.

Since, then, each party is entitled to presumption of innocence which directly conflict with those of the other, and are equally powerful, the court will not entertain one presumption in preference to another, but should ignore both in the decision of the case. For

this, we find authority in law, as well as in reason. 2 Am. Lead. Cas. 704. Gibson v. the State, 38 Miss. 313, is in point here. This principle, in relation to the continuance of life, bears a two-fold aspect: 1. In the absence of proof to the contrary, life is presumed to continue during a period of seven years; 2. After the passage of seven years, death is presumed to have occurred. In no author do we find a hint that the one presumption is of more force than the other. Now, in Gibson v. the State, counsel for the appellant sought to overthrow the last branch of this principle, not the first. The man Williams had been absent more than five years, the legal presumption of his death had attached, his wife had married Gibson, who afterwards had married the woman Ann Cochran without a divorce; and, under an indictment for bigamy, it became necessary, to Gibson's defense, to show that his first marriage (to Mrs. Williams) was invalid. To do this, he invoked his presumption of innocence in order to overthrow the statutory presumption of Williams' death, just as, in this case, the appellant invokes her presumption of innocence to overthrow the statutory presumption of Roberts' life. The court refused to entertain such a proposition, saying that this marriage with Mrs. Williams was to be presumed innocent as well as that with Ann Cochran; and, between the two conflicting presumptions, the statute was permitted to stand unshaken and the prisoner was convicted.

The foregoing views will be found to be borne out by an analysis of the authorities cited by appellant's counsel. Section 35, 1 Greenl. Ev., is founded on the case of Williams v. the East India Co., 3 East. 192, which is adverted to in 2 Am. Lead. Cas. 704, and held to be ill considered, in that it ignores the fact that the master who received the inflammable articles should be presumed innocent of a criminal negligence, as well as he who shipped them. The pages in 2 Am. Lead. Cas.,

which counsel cite, contain nothing contradictory to this principle. In Hull v. Rawls, 27 Miss. 471, the court rejected a statement of Rawls, the decedent, which was the only testimony that would even tend to show that the death of the first wife might not have been well known at the time of the second marriage; and also states that even if the first wife were known to be alive, there was no proof before the court that she had not been divorced from the decedent previous to his marriage to the appellee. Moreover, in that case, the indulgence of a presumption that the appellee was innocent involved no imputation of crime to the first wife of Rawls, the decedent; whereas, in this case, to presume the appellant innocent would be inevitably to presume another guilty; and this difference between the two cases is alone fatal to Hull v. Rawls as an authority. The use of Spears v. Burton as a precedent is fallacious, for the same reason. There, a presumption of Mrs. Burton's innocence cast no stain on any one, and it was properly indulged; here, such a a presumption does fix a stigma on others, and its indulgence would be improper. In relying on Gibson v. the State, 38 Miss. 313, opposing counsel seem to us to be leaning on a reed worse broken than any of the others. To grasp the full significance of this case, it should be read in connection with Spears v. Burton, and carefully compared with it. The able counsel for both the prosecution and the defense relied on Spears v. Burton as authority for themselves. The same learned judge delivered the opinion of the court in each case, and cites and approves Spears v. Burton in his decision. Both cases were adjudicated entirely on legal presumptions; and in both we find the same presumption of innocence of bigamy invoked and insisted on in order to overthrow, in the one case, a presumption of life, in the other, a presumption of death—the two co-ordinate branches of the one principle. Yet,

notwithstanding all this similarity and parallelism in " the conclusion of the whole matter," there is a difference which is fatal to the appellant in this cause. In Spears v. Burton, the presumption which is attached is overthrown; in Gibson v. the State, it is not. Now, there must be some explanation of this remarkable difference in the result of these cases, and it is found in the fact that the very element *which enters into the* case at bar, and which is not found in Spears v. Burton and its cognate cases, does enter into Gibson v. the State—a second marriage which is entitled to its presumption of guiltlessness.

In the case of Spears v. Burton, on which appellant so confidently relies, speaking of the missing husband, the court say: " Unless he was shown to be then living, the presumption must be indulged that he was dead; because, otherwise, the second marriage would be held criminal, by reason of a presumption " (that of his life), " which would be to establish a crime upon a bare presumption." Here we have the principle in a nut-shell; the law will not presume a crime.

Now, for this court to hold that appellant's marriage with decedent was invalid, and that Mary Eliza Wilkie's marriage with him was valid, would not " be to establish a crime upon a bare presumption." The admitted facts of this case are such as to exclude every hypothesis of innocence of bigamy in all parties. In fact, the crime is virtually conceded. The dilemma is so irrefragible that there is no escape from the conviction that some of these parties, either appellant or decedent, or Mary Eliza Wilkie, have committed a bigamy. At the time of appellant's marriage with the decedent, her first husband, Roberts, was either alive or dead. If he was alive, then her marriage with decedent was bigamous; if he were dead, then her marriage with decedent was valid; but decedent's subsequent marriage with Mary Eliza Wilkie was biga-

mous. Hence, the court is not called upon to presume a crime, or to decide whether a crime was committed; but only to decide which of these parties shall stand charged with a crime, commission of which, by some of them, cannot be doubted.

Under this view of the case, all questions of presumptions of innocence fall to the ground. For either party to demand to be held guiltless, at the expense of the unavoidable stigmatizing of the other, with no better reason for such a demand than that in law she is presumed innocent, would be no less unreasonable in law than in fact. The legal presumption of Roberts' life, then, stands without even the ghost of a principle to assail it, and clearly designates the appellant as the party who must lose by this controversy. *Ignorantia juris non excusat;* and it is but just that she who married in direct opposition to the law of the land should suffer by it, rather than she who married in accordance with that law. By her marriage with decedent, appellant directly violated the spirit of the statute; and now she relies on that very violation, and that alone, as a reason for abrogating and annulling the statute altogether. Such demands have been yielded to by the courts in other cases, rather than to criminate the transgressor and subject him to a criminal prosecution; but has it ever been done in favor of the person violating the law, when the very tenderness shown to him necessarily results in the extremest harshness towards, and fixes the gravest felony on, an innocent party, who has married in reliance on that very statute?

Appellant admits that in the fall of 1868, she deserted the decedent, Wilkie, without informing him of her design, and took up her abode in Arkansas, where she remained until after the decedent's death; that she knew of decedent's marriage to Mary Eliza Wilkie, and uttered no word of remonstrance either to the

decedent or to the said Mary Eliza, or to any of appellant's own family, who were living in Yalobusha county at the time. These facts, taken in connection with the rash and highly improper haste of her marriage with decedent, show an indifference to the sacred obligations of the married state, a levity in tearing herself away from such ties, and, according to her own statement, a connivance at a bigamous connection which cannot but weigh heavily with the court, and materially aid it in coming to a just conclusion as to the merits of this cause. The deposition of appellant states, that in his last letter to her, her husband, Roberts, informed her that he was lying very ill at some town in Louisiana (name not remembered); that he had to be propped up in bed with pillows in order to write, and that he would come home as soon as he could. We submit that there is a grave objection to the credibility of this letter. In the first place, it is exactly such a letter as a man who was forsaking his wife and wanted to quiet all inquiry, and prevent any search, would have written. Such artifices are too common to need comment. In the second place, the fact which is sought to be proved by the contents of that letter, viz.: Roberts' death at that time of that illness, is, under the circumstances, exceedingly improbable. This letter was written in the latter part of 1859, a period of profound peace and free communication; if it shows anything, it shows that Roberts was attended in his illness with extreme kindness. He was furnished materials for correspondence, propped up in bed with pillows that he might write, his letters were faithfully posted, etc. And yet we are asked to believe that those persons who had so kindly attended him in his illness had stood about his bed and heard the pathos which always breathes in the last utterances of the dying, had seen the last faint light of love and life fade from him forever, in the midst of

strangers,—that these persons were so deficient in the commonest impulses of humanity as to write no line to the bereaved wife, telling her the sad story of her husband's decease, and of the spot where she might find his ashes. Is it not incredible? Or, if there was such a community amongst us (which God forbid!), is it not as fully incredible that the members of it would alogether have failed speedily to present to the stranger's family their bills for the expenses of his last illness and burial?

It will probably be insisted that the fact, that Roberts has not been heard from to this day, should influence the decision of the court. The strength of this argument is very much impaired by the fact that immediately after the marriage of appellant to decedent, a violent civil war deluged the county for years; that all communication was stopped in a greater or less degree, especially between this and the trans-Mississippi country. That thousands of men disappeared forever from the knowledge of their families, with whom they were anxious to keep up intercourse, much more from those from whom they were anxious to secrete themselves. If Roberts is dead, which, however, by no means follows from the failure of his wife, who has married again, to hear from him, it is not unreasonable to suppose that he died during the war, and at a period too late to aid the appellant in this controversy. The court will judicially know of this war and its history. 1 Greenl. Ev., § 5.

SIMRALL, J.:

By agreement of counsel, the substantial subject in contestation between the parties is to be considered and decided by the court, all technical forms being waived.

The real question in issue is, whether Mary Elizabeth Roberts was lawfully married to Sylvester Wilkie, on

the 30th of April, 1861. That question will be answered, as it shall be determined whether her former husband, Napoleon Roberts, was then living or not.

These facts are admitted by the parties: that on the — of ———, 1859, the said Mary Elizabeth was lawfully married to her first husband, Napoleon Roberts; that Roberts left his wife about the 30th of October, 1859, and no news of his death has ever been received. On the 30th of April, A. D. 1861, the said Mary Elizabeth was married to Sylvester Wilkie, with whom she cohabited until the fall of 1868, when, without his knowledge, she left him, and went to the state of Arkansas, where she has ever since resided with her daughter.

In September, 1869, Wilkie married another woman by the name of Mary Eliza.

Wilkie having died, this controversy arises on the application for letters of administration on his estate, Mary Elizabeth Wilkie, formerly Roberts, claiming a preference as his lawful widow.

About two years after Roberts left home, Mrs. Roberts married Wilkie.

There is always a presumption that every individual conforms his conduct to the requisitions of duty, as prescribed by law. It belongs to universal jurisprudence, that innocence of an act which the law forbids and denounces as criminal shall be presumed. Therefore, if a man or woman contracts a marriage in due form, the presumption is that the marriage is legal, that is, that there was no legal impediment in the way. It was very properly said in Powell v. Powell, 37 Miss. 785, that the "law favors marriage," and "requires clear testimony to invalidate it." The superstructure of society rests upon marriage and the family as its foundation. The social relations and the rights of property spring out of it, and attach to it, such as dower, administration, distribution and inheritance. All controversies, therefore, growing out of marriage,

assume the dignity and importance of *quasi* public questions.

The marriage of Mrs. Roberts with Wilkie is said to be bigamous because, at the time it was contracted, Roberts had not been absent for five consecutive years without being heard from, and therefore the presumption did not arise that he was dead. Code of 1857, p. 577, art. 27.

The precise fact to be ascertained is, whether Roberts was living when Mrs. Roberts was married the second time. If no other fact appeared, but simply the marriage, the presumption is in favor of validity. But there is also a presumption in favor of the continuance of life, which is only overcome by a protracted absence for the time specified. In such circumstances, founded on considerations of policy, and in favor of innocence, the presumption in favor of the marriage will prevail as against that of the continuance of life; and it will devolve upon the disputant of the marriage to overcome it by testimony that the first husband was living at the time of the second marriage. 1 Greenl. Ev., § 35; Rex v. Twining, 2 B. & Ald. 385. In Rex v. Harborne, 2 Ad. & El. 540, it was proved that a letter had been written by the first wife, from one of the colonies, only twenty days before the husband married the second time; this was deemed sufficient to warrant the presumption that the wife was living.

The case reported in 2 B. & Ald., *supra*, arose in respect to a settlement in the parish; the woman, twelve months after the husband was last heard from, married a second husband, by whom she had children. It was held that it was rightly presumed that the first husband was dead at the time of the second marriage. This application of the principle was accepted and adopted in Spears v. Burton, 31 Miss. 5̶6̶8̶. 547. The action was ejectment. The title was claimed by descent, cast upon the issue of the marriage, which was impugned

as illegal, because the marriage with Burton, the plaintiff's father, took place within five years after the desertion of Bayard, the first husband; therefore there was no presumption of his death; and it was incumbent on the plaintiff to prove his death. The court, however, affirm the rule to be, that the presumption is that the marriage was valid, and the *onus* was upon the defendant to show the contrary by proving the first husband living at or shortly before the date of the second marriage. Gibson v. State, 38 Miss. 322, was a prosecution for bigamy. The court declare that there is no difference between the civil and criminal consequences when the fact of marriage in due form of law has been proved.

The presumption in favor of the marriage of Mary Elizabeth with Wilkie is greatly sustained and aided by the testimony. It was in evidence that her relations with her first husband, Roberts, were agreeable and pleasant; that he left home in the fall after the marriage to go to Louisiana on business; that he wrote several times to his wife; the last letter, written from a sick bed, stated that so soon as he recovered he would return home. He was represented as a delicate man in feeble health. The correspondence suddenly ceasing, and Roberts not being heard from for quite a year, when Mrs. Roberts married again, begets the strong impression that his feeble frame succumbed to the disease which was upon him when he wrote the last letter to his wife, and that when she married Wilkie she was a widow. Such was the belief of the family. Connect this part of his history with the further circumstance that the other contestant offered no testimony that Roberts was ever aferwards heard of by his family connections and friends, and the inference is legitimate and strong that he died about the time supposed by his wife. The controversy originated about this administration in 1871, eleven years after Mrs.

Roberts supposed that her husband had died, and about nine years after she had married Wilkie, the intestate; and yet in this long interval nobody has ever heard of him alive.

At the time of Mrs. Roberts' second marriage the facts shown in evidence were sufficient to satisfy her that her first husband was dead; acting on that belief, she married a second time. The last marriage cannot be invalidated except by proof that the first husband was living at the time, or so shortly before as to put upon her the necessity of proving his death. That has not been done in this case. We are therefore of opinion that the appellant, Mary Elizabeth Wilkie, is the lawful widow of the intestate, and has the preference over the appellee to administer on his estate.

*Decree reversed and cause remanded.*