WHITMAN *v.* WHITMAN

In Banc. June 13, 1949.

(41 So. (2d) 22)

J. V. Gipson, J. E. Palmer, Champ C. Gipson, and Wilbourn & Wilbourn, for appellant.

Crain, Crain & Smith, for appellee.

Hall, J.

Dorothy Whitman and Ethel Gaines Whitman filed a bill of complaint on October 9, 1947, against Mary Ward Whitman seeking to have Dorothy Whitman adjudged to be the sole heir at law of John H. Whitman, who died intestate on November 30, 1940. The suit is based upon a charge that John H. Whitman and Ethel Gaines Whitman contracted a valid common law marriage in Meridian, Mississippi, about the year 1910 or 1911 and lived and cohabited as husband and wife until after Dorothy was born on June 17, 1914, subsequent to which it is alleged that John contracted a ceremonial marriage with Mary on June 4, 1918, without having been divorced from Ethel. Ethel having herself remarried without a divorce, and being thereby precluded from claiming anything for herself as an heir of John, generously waived all her claim in favor of her daughter Dorothy. Mary Whitman filed an answer denying that there had ever been a common law marriage between John and Ethel and denying that Dorothy was an heir of John, and also filed a cross-

bill alleging that at the time of his death John was indebted to Meridian Building & Loan Association in the amount of $1,349 principal and interest secured by a deed of trust on the real estate described in the bill, which amount was subsequently paid by Mary, and she claimed a lien upon the said real estate for this amount in the event Dorothy should be adjudged to be an heir of John.

Evidence was offered by both parties, at the conclusion of which the Chancellor entered a decree adjudging the alleged common law marriage to be valid and the ceremonial marriage invalid and declaring Dorothy to be the sole heir of John and the owner of the land in controversy subject to a lien in favor of Mary for the amount aforesaid, from which decree Mary appeals.

John and Mary lived together from the time of their ceremonial marriage on June 4, 1918, to the time of his death in 1940. They had no children, but during this period of time they adopted two children, and appellant contends that these two children were necessary parties to this suit. ██ █ Appellant's position would be correct if the decree of adoption had made these children lawful heirs of John and Mary, but the decree did not so adjudicate and consequently they have no interest in John's estate and are not necessary parties. Leonard v. H. Weston Lumber Co., 107 Miss. 345, 65 So. 459; Fisher v. Browning, 107 Miss. 729, 66 So. 132, Ann. Cas. 1917C, 466; Beaver v. Crump, 76 Miss. 34, 23 So. 432.

Appellant also contends that the trial court erred in adjudicating the alleged common law marriage to be valid, in holding the ceremonial marriage to be invalid, and in decreeing Dorothy to be the sole heir of John Whitman. We are of the opinion that this contention is well taken and that the decree is so completely contrary to the overwhelming weight of the credible evidence and is so manifestly erroneous that it should not be permitted to stand.

Ethel Gaines testified to support her alleged common law marriage to John, and said that somewhere about

1910 or 1911 John "just said we will say we are married and I will call you Miss Ethel Whitman and you will be my wife, and he came out there and stayed with me". She claimed that they set up housekeeping and that John lived with her continuously from 1911 to 1917, and that the child, Dorothy, was born June 17, 1914, and yet she admitted that John "had a room down town". Putting aside the question whether Ethel was a competent witness to establish this alleged marriage after the death of John, she was able to produce only one other witness to substantiate her claim, and this was a Negro woman who moved away to St. Louis about 1915 and remained there for seventeen years; this woman did not claim to have been a witness to the alleged marriage agreement but merely testified that she went to Ethel's house frequently before Dorothy was born, and that Ethel and John were living together and holding themselves out as husband and wife. In the whole City of Meridian, with a poulation of some 35,000 people, Ethel was not able to find one other living soul who would say that she and John had lived together.

On the contrary, Mary, who was married to John on June 4, 1918, by a ceremonial wedding duly solemnized under authority of a marriage license in compliance with the laws of this state, produced witness after witness who testified positively that John and Ethel did not live together under the same roof and did not hold themselves out as husband and wife. It was established beyond any sort of question that from 1911 to March 5, 1918, John Whitman maintained a room and resided therein with another Negro man named Jimmie Cramer in a place called "bachelor's quarters" upstairs over a cafe in the City of Meridian, on which last named date Jimmie went to the army and John continued to live there for about three months longer until he married Mary.

Ethel Gaines' mother had died prior thereto and in 1910 her father married the second time, and Ethel's step-mother testified that she never heard of Ethel and

John claiming to be married; she lived there in the same community and after Dorothy was born in 1914 she kept Dorothy most of the time until Ethel moved to Texas.

Ethel testified that when John married Mary in 1918 she, herself, moved away to Texas and stayed there for a while and came back to Meridian for a while, and finally went back to Texas permanently in 1924. She further testified that when she learned that John was courting Mary ''to keep from keeping up a row I decided to let him and this woman go''. She also testified that she told John to let Mary alone and he didn't do it, and ''Q. Then what did you do? A. Let him go. I went to San Antonio in 1918, stayed a while, came back here and stayed around until 1924 and then moved out there.''

In 1925 Ethel married a man named Harbert in San Antonio and lived with him until his death in 1939. In our opinion Ethel's admitted acts in letting her alleged husband John go through a ceremonial marriage with Mary in 1918, in making no complaint thereat, in moving off to Texas and abandoning her claim to her so-called husband, John, and in contracting a ceremonial marriage in Texas without obtaining a divorce from John, show almost conclusively that there was never any valid common law marriage between John and Ethel. Certain it is that she did not so recognize it when she raised no objection to John's ceremonial marriage to Mary, and when she herself contracted a ceremonial marriage to another man and lived with him until his death.

Dorothy testified in her own behalf and manifested a most remarkable memory. She claimed that she could remember John and Ethel living together, and John calling Ethel his wife and Ethel calling John her husband. She said that she was four or five years of age when she began to remember these things, and yet it is shown by the record that she was born in June 1914 and that in 1917, when Dorothy was only about three years of age, John was courting Mary and was no longer devoting any attention to Ethel, and Ethel ''decided to let him and

this woman go." Then Ethel moved off to Texas in 1918 about the time John married Mary. Certain it is from the testimony of Ethel that Dorothy was only approximately three years of age when Ethel and John had their final separation if, in fact, they ever lived together. It simply overtaxes our credulity to attach one iota of weight to the testimony of Dorothy with reference to the alleged common law marriage between her mother and John.

John Whitman died in 1940, after having lived with Mary for 22 years. During that time they had accumulated a. little property. The last few years of his life found him in wretched health, and Mary remained with him and ministered to him until the last, relying implicitly upon her ceremonial marriage to him. In our opinion, to permit Ethel's child Dorothy to come in and take the estate accumulated in John's name by a suit filed some seven years after his death, would be opening the door to unbridled fraud and inviting illegitimates throughout this State to claim the estates of their reputed fathers, rendering bigamous many ceremonial marriages contracted in good faith, and bastardizing the offspring thereof.

Under the law there is a strong presumption in favor of the validity of the ceremonial marriage as against the prior alleged common law marriage. In the early case of Powell v. Powell, 27 Miss. 783, decided 95 years ago, this court committed itself to this doctrine from which it has never departed. It was there said "The law favors marriage, and, when once solemnized according to the forms of law, will not declare its nullity upon anything less than clear and certain testimony, especially after it has been dissolved by the death of one of the parties."

In Wilkie v. Collins, 48 Miss. 496, this court said "Therefore, if a man or woman contracts a marriage in due form, the presumption is that the marriage is legal, that is, that there was no legal impediment in the way.

It was very properly said in Powell v. Powell, 27 Miss. 785, that the 'law favors marriage' and 'requires clear testimony to invalidate it.' The superstructure of society rests upon marriage and the family as its foundation. The social relations and the right of property spring out of it, and attach to it, such as dower, administration, distribution and inheritance. All controversies, therefore, growing out of marriage, assume the dignity and importance of quasi public questions."

These two cases were cited with approval in the recent case of Harper v. Fears, 168 Miss. 505, 151 So. 745, 93 A. L. R. 341, and there are numerous other Mississippi cases which adhere to the same rule.

The Mississippi authorities are in accord with the majority rule elsewhere. In 35 Am. Jur., Marriage, Sec. 195, it is said "The majority view is that a second or subsequent marriage of a person is presumed to be valid, and such presumption is stronger than, and overcomes or rebuts, the presumption of the continuance of the previous marriage, and the burden of proving the continuance of the previous marriage and the invalidity of the second marriage is upon the party attacking the validity of the subsequent marriage." This section deals, of course, with the question of a continuance of the first marriage, but Section 199 of the same volume, dealing with presumptions as between common law marriages and ceremonial marriages, says "The presumption of marriage from cohabitation and reputation is rebutted or overcome by proof of a subsequent ceremonial or actual marriage, since the presumption of the validity of such marriage is stronger than the presumption of the previous marriage from cohabitation and reputation."

In 55 C. J. S., Marriage, § 43, page 893-894, it is said, "In the case of conflicting marriages of the same spouse, the presumption of validity operates in favor of the second marriage. Accordingly the party attacking the validity of such second marriage has the burden of proving such invalidity, even though it involves the proving

of a negative; and the burden of showing a valid prior marriage is on the party asserting it." And in the same volume, 55 C. J. S., Marriage, § 43, at page 896 it is said, "The presumption of the validity of the last marriage has been held to be the strongest presumption known to the law; and in the absence of additional facts or circumstances it must prevail over all conflicting presumptions, such as presumptions as . . . to the validity . . . of a prior marriage." It is of course true that all presumptions must yield to the proof, but as to the degree of proof necessary to establish and sustain a common law marriage it is said in 55 C. J. S., Marriage, § 45, page 911, "A claim of common-law marriage is regarded with suspicion and will be closely scrutinized. Thus, in order to establish a common-law marriage, all the essential elements of such a relationship . . . must be shown by clear, consistent, and convincing evidence, especially must all the essential elements of such relationship be shown when one of the parties is dead."

Bearing in mind the language of the first Mississippi case above cited that the law will not declare the nullity of a ceremonial marriage "upon anything less than clear and certain testimony, especially after it has been dissolved by the death of one of the parties", and also bearing in mind the general rule as laid down in Corpus Juris Secundum, last quoted, that a common law marriage must be established "by clear, consistent, and convincing evidence" and applying these principles to the case presented by the record here, ▉▉ we find that the proof of Ethel's alleged common law marriage with John is neither clear, consistent, nor convincing. Ethel made a gesture toward establishing the relationship by her own testimony, and sought support from her daughter, Dorothy, who was only three years of age when Ethel and John allegedly separated, and sought further support from the testimony of a woman who had seen John at Ethel's home and in bed with her, yet Ethel herself admitted that John "had a room down town" and it was

shown by numerous witnesses that during the entire period when Ethel claims the existence of a common law marriage John was occupying this room down town with another man who was his closest friend and to whom he never one time intimated that he had a wife. When Ethel could not find but one witness in a city of 35,000 people who ever heard of her alleged common law marriage with John, and when numerous witnesses who were well acquainted with John testified that he continuously lived in bachelor's quarters until he married Mary in 1918, we are of the opinion that Ethel's proof is not clear or convincing, but, on the contrary, is wholly repudiated as against the strong presumption attendant upon a ceremonial marriage on proper license under the laws of this state.

Furthermore, Ethel's evidence is not in anywise consistent. When she learned that John was courting Mary in 1917 and when she knew that John married Mary in June 1918, she did not one thing that the average wife, thus outraged, would have normally done. She did not have any prosecution for bigamy instituted against John or Mary. She did not bring a suit for alimony and child support against John. She simply, in her own words, ''decided to let him and this woman go.'' Furthermore, she went off to Texas and in 1925, without obtaining a divorce from John, contracted a ceremonial marriage herself with another man and lived with him until his death in 1939. None of these acts are consistent in any manner with her claim, propounded seven years after John's death, that she and John had contracted a valid common law marriage. In our opinion the decision of the lower court is so manifestly wrong, and so wholly against the overwhelming weight of the evidence, that it should not be permitted to stand. If such a decision is permitted to become the law of Mississippi the invitation is extended to all women who have been guilty of acts of indiscretion to bide their time, even though it may be a period of twenty-

nine years, as in this case, or even half a century, and wait until after the death of her alleged paramour and then step in and establish a claim for her illegitimate offspring against the estate of such deceased, notwithstanding the fact that he may in the utmost good faith have contracted a ceremonial marriage and lived for a third or even half a century with one who has been faithful to him unto the last.

The decree of the lower court is therefore reversed and judgment here entered for appellant.

Reversed and judgment here.