ROBERTSON, Justice,
for the Court:
I.
At issue this day is whether a minister of the California-based — and not uncontroversial — Universal Life Church (ULC) may in this state solemnize the rites of matrimony so that the persons participating in those rites are legally married. The case turns on whether the Universal Life minister is a “spiritual leader” of a “religious body” within the meaning of our statute law. We hold that the ULC minister was legally empowered and that the purported marriage at issue here was validly effected. The Chancery Court’s decision to the contrary is reversed.
II.
In 1984, Cobert C. Blackwell was a 58-year-old widower living in Walthall County, Mississippi. Blackwell and Nadine B. Fortenberry became enamored of one another and on November 8, 1984, the two obtained a marriage license in Walthall County.
The next day, a Friday, our couple set sail for Jackson (of all places) in search of legal blessing for their bliss. They checked into the Holiday Inn Southwest at around 4:00 or 4:80. Blackwell called a Hinds County Justice Court Judge, Jack Bass, and talked to the Judge’s wife. Apparently Blackwell requested that the judge come to the motel room and marry them there but was told the judge would only marry people at his office.
Mrs. Bass referred the two to Claude Clark, suggesting that Clark was authorized to perform the marriage. They then contacted Clark who agreed to perform the marriage. On the following morning, Saturday, November 10, 1984, Clark performed the marriage ceremony and signed the marriage license. Shortly thereafter, the newlyweds returned to Walthall County and began living together and holding themselves out as man and wife.
As fate would have it, on February 7, 1985, Cobert Blackwell died. Blackwell left a will which he had executed on July 28, 1980, which devised his real property to his first wife, Margaret (who had predeceased him), for life, remainder to his brothers and sisters in equal parts.[1]
In due course, the will was offered for probate and on February 14, 1985, Mary Ella B. Magee, Blackwell’s sister, was appointed executrix and letters testamentary issued. Thereafter, on March 4, 1985, Nadine, the new Mrs. Blackwell, renounced the will, requested a widow’s allowance and her share of the estate under the statute of descent and distribution.
Blackwell’s brothers and sisters promptly challenged Nadine’s rights, claiming that she and Blackwell were not lawfully married because Claude Clark was not a person qualified under state law to perform marriages. Specifically, we are told that the Universal Life Church is not a “religious body” and that Clark is not a “spiritual leader” within the meaning and contemplation of the statute. Miss.Code Ann. § 93-1-17 (1972).
After a hearing, and the submission of briefs of counsel, the Chancery Court on September 15, 1986, ruled that Claude Clark was not a minister fitting within the requirements of Miss.Code Ann. § 93-1-17 (1972). “He is not a minister of the gospel as contemplated by the statute, nor is he a spiritual leader of a religious body. Therefore, the couple was not married and Nadine Blackwell is not his widow.” Her petitions were dismissed finally under Rule 54(b), Miss.R.Civ.P., and this appeal has followed.
III.
Whatever its historical, cultural or religious origins, marriage is a function of the *1195 positive enabling laws of the state. Whether a man and woman be married turns upon their compliance with state imposed prerequisites and forms. Pickens v. Pickens, 490 So.2d 872, 875 (Miss.1986). Where an “i” has been left undotted or a “t” uncrossed, the parties are simply not married, common law marriages having long ago been abolished. Miss.Code Ann. § 93-1-15 (1972).
This state takes no neutral stance regarding marriage, and in this regard we are not unaware of many policy pronouncements which on their face appear of relevance. For example, we find it written more than once that
The law favors marriage, and, when once solemnized according to the forms of law, will not declare its nullity upon anything less than clear and certain testimony, especially after it has been dissolved by the death of one of the parties.
See Whitman v. Whitman, 206 Miss. 838, 843, 41 So.2d 22, 25 (1949); and Powell v. Powell, 27 Miss. 783, 784 (1854). But this begs the question, which is whether the Blackwells’ marriage was ever “solemnized according to the forms of law.”
Only a select few have been empowered to perform with legal effect rites of matrimony, and we look to our statute law to identify those. Miss.Code Ann. § 93-1-17 (1972). Among those so empowered are “any ... spiritual leader of any ... religious body....” The Chancery Court held that Claude Clark was not one within the statute and, accordingly, declared the Blackwells’ purported marriage void ab ini-tio. Nadine's appeal requires that we carefully examine the point.
Our focus is upon Claude Clark and the Universal Life Church. Clark is, by occupation, a constable of Hinds County, and by religion, a practicing Methodist. His only basis for any claim that he is a person authorized to perform marriages in Mississippi is his “Credentials of Ministry” secured in September of 1984 from the Universal Life Church of Modesto, California.
About two months before he “celebrated the rites of matrimony” between Cobert and Nadine, Clark had written to the ULC inquiring what was required to become one of its ministers. He received in the mail from it a paper entitled “Credentials of Ministry” by which the ULC certified that the bearer was an authorized minister. The space for the name of the bearer was blank, and Clark filled in his name.
The Universal Life Church was established by Kirby J. Hensley, an illiterate Baptist minister from North Carolina. He undertook to educate himself and in the process was influenced by his reading in world religion. Over the years, he conceived the idea of the universal church that would bring people of all religions together instead of separating them.
In 1962, Hensley founded the Universal Life Church having previously opened a “church” in his garage in Modesto, California. Though Hensley had his own ideas about theology, he felt others had a right to their own theories. He began to ordain ministers free, for life, without question. He would present a signed ordination certificate and a one-page information sheet on the ordination merely for the asking. Though ordination was free, a doctor of divinity later cost $20.00, and was offered with ten lessons on how to set up and operate a church.
California, however, enjoined Hensley from issuing a degree from an unaccredited institution, so the Department of Education was moved to Phoenix, Arizona. ULC has since made a not insignificant contribution to federal income tax jurisprudence. See Hall v. Commissioner of Internal Revenue, 729 F.2d 632 (9th Cir.1984); Seward v. United States, 515 F.Supp. 505 (D.Md.1981); and Universal Life Church, Inc. v. United States, 372 F.Supp. 770 (E.D.Calif.1974).
Beyond this, Hensley has initiated several “reforms” by marrying a couple in a trial marriage, and marrying two girls at the 1971 Universal Life Church festival. A newspaper, Universal Life, is issued irregularly from the Modesto, California, headquarters. An annual convention is held. Over 16,000 were present in 1971. By 1977, the Universal Life Church claimed to have ordained more than 6,000,000 minis *1196 ters. Some 25,000 of those had formed congregations that meet regularly, usually small groups in house-churches.
All in all, ULC is hardly a conventional church by Bible Belt standards.
Constable Clark became a minister of the Universal Life Church in September of 1984. As Clark explained, one of the deciding factors was that the Justice Court Judges had gone on salary and therefore were no longer receiving fees for performing weddings. The judges in Hinds County therefore had discontinued performing weddings away from the office on nights or on weekends.
Clark knew some friends who had credentials of ministry with the Universal Life Church and, as a result, he wrote the church, having previously checked with the Attorney General’s office which told him that this would be legal. He also checked with his attorney who gave his approval. He wrote the church a letter, asked them what they required and in return, they sent him the credentials of ministry, an I.D. card. Clark is still a Methodist layman and active in the Methodist church. From his testimony, his religious administrations as a minister of the Universal Life Church were restricted to performing weddings and giving devotions.
According to Clark, the church has no set doctrine per se, but one can worship God in the way that one sees fit and is comfortable with as long as it does not infringe on the rights of others. One is not required to express a belief in God or any deity before he can be a minister of the Universal Life Church. Before becoming a minister, Clark was not required to learn anything about the Universal Life Church or any religious belief that they had.
Clark, at the time of the marriage disputed here, had already performed several marriage ceremonies, a number of them in churches in the Jackson area and the chapel at the Mississippi Agricultural Museum, although it was not clear which of these' weddings was performed before and after the wedding in controversy. On cross-examination, he estimated that he had performed twelve to fifteen marriage ceremonies before he conducted this one. The marriage ceremony he used was from the Abington Marriage Manual which he purchased at the Baptist Book Store in Jackson.
We are not unaware that the power of ULC ministers to perform marriage ceremonies has been litigated in at least three other states. New York rejects ULC ministers but under a statute far more restrictive than ours. See Rubino v. City of New York, 125 Misc.2d 936, 480 N.Y.S.2d 971 (1984); and Ravenal v. Ravenal, 72 Misc. 2d 100, 338 N.Y.S.2d 324 (1972). Virginia has done likewise. Cramer v. Commonwealth, 214 Va. 561, 202 S.E.2d 911 (1974).
North Carolina originally held a ULC officiated marriage void in the context of a prosecution for bigamy. State v. Lynch, 301 N.C. 479, 272 S.E.2d 349 (1980). The year after the Lynch decision, however, the North Carolina General Assembly passed an act which validated marriages performed by Universal Life Ministers prior to that date, unless they had already been invalidated by a court of competent jurisdiction. This curative statute is codified as N.C.G.S. § 51-1.1 (1984). See Fulton v. Vickery, 73 N.C.App. 382, 326 S.E.2d 354, 356-57 (1985).
The experience in other states in matters such as this is always of value. We find the North Carolina experience particularly intriguing. In the end, however, we are confronted with our own statute ultimate construction of which is our non-delegable duty. We confront this day no imperative that we establish some hard-edged line of demarcation prescribing minimum qualifications for one authorized to solemnize rites of matrimony under Section 93-1-17. Claude Clark is enough of a “spiritual leader”, and the Universal Life Church is enough of a “religious body” that, in the eyes of the law of this state, Cobert C. Blackwell and Nadine B. Fortenberry became husband and wife on November 8, 1984, and this is sufficient unto the day.
The judgment of the Chancery Court is reversed and this matter is remanded for *1197 further proceedings not inconsistent with this opinion.
REVERSED AND REMANDED
PRATHER, ANDERSON and ZUCCARO, JJ., concur.
SULLIVAN, J., concurs in result only and specially concurs by separate written opinion.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and GRIFFIN, J., dissent by separate ■written opinion.

. Apparently Blackwell had seven brothers and sisters, each of whom is named in the will, to-wit: Mescal B. Wood, Inis B. Holmes, Mildred B. Henderson, Blanche B. Johnson, Mary Ella B. Magee, O.L. Blackwell, Jr., and LaRue H. Blackwell.