S. Samuel Di Falco, S.
This is a proceeding instituted pursuant to section 145-a of the Surrogate’s Court Act for a determination of the validity and effect of the election by the surviving spouse to take against the will. The deceased died on August 1, 1954 leaving a will which he had executed on March 17, 1953 and which was admitted to probate in this court on August 31, 1954. In that instrument, acknowledging the peti *397 tioner to be bis wife, he named her as life beneficiary of a trust consisting of one third of his residuary estate which has a conceded value in excess of $600,000. The petitioner contends that the will provisions for her benefit are subject to the infirmities held by the Court of Appeals in Matter of Wittner (301 N. Y. 461) to disqualify a trust from satisfying the minimal requirements prescribed by section 18 of the Decedent Estate Law in that invasion of the principal for the benefit of other persons is permitted. Consideration of this issue will be postponed for the determination of the other questions formulated by the pleadings.
The petitioner met the decedent in 1940. .At that time she was still married to her first husband, one Sam Cohen. She obtained a divorce from Cohen in Nevada on June 12, 1942 but she now concedes that that divorce was invalid for want of jurisdiction and that as a result her marriage to the deceased which took place on June 27, 1942 was void. She contends, however, that a ceremonial marriage between the deceased and herself, celebrated on August 30, 1945 subsequent to the date of the death of her first husband, establishes her status as the widow of the deceased. Relying upon this state of facts she insists an antenuptial agreement between herself and the testator, dated June 18, 1942, was drawn with reference only to the marriage, now asserted to be invalid, which was solemnized in New Jersey on June 27 of that year and that because that marriage was invalid the antenuptial agreement falls and the waiver which it contains, since it bore no reference to the 1945 marriage between herself and the deceased, cannot now bar her from asserting her right to an intestate share in the estate.
The executors, resisting the claim, contend that the second marriage between the parties was invalid because of the failure to obtain a marriage license, because the rabbi who performed the ceremony in this city on August 30, 1945 had not registered with the city clerk in accordance with the provisions of section 11-b of the Domestic Relations Law and, finally, because his status as a clergyman was not affirmatively established by the petitioner. The pleadings thus fix the existence of a valid marriage between the petitioner and the deceased as the issue that must first be determined. This will depend upon the effect required to be given to the ceremony that took place on August 30, 1945. On that occasion, according to the testimony of one Harry Gtoldberg, he accompanied his father-in-law whom he described as Rabbi Max Levy, at the latter’s request, to an . office in a building located at 1441 Broadway in New York City. He stated that Rabbi Levy, now dead, there performed a Hebrew *398 marriage ceremony between the deceased and the petitioner and issued to them a certificate written in Hebrew attesting to the fact of the marriage. This document which was received in evidence together with its English translation, bore the signatures of the deceased and the petitioner as principals and that of the witness as a witness on that occasion as well. Upon being cross-examined, Mr. Goldberg testified that his father-in-law had resided in New Jersey. He stated that he had never seen Mr. Levy deliver a sermon or perform the other duties of a rabbi. He had not been present at his ordination, he had never been in a synagogue where Mr. Levy had officiated as a rabbi and he knew of no rabbinical organization of which the latter was a member. The respondents rely upon these facts together with the parties’ failure to obtain a marriage license and the failure of Rabbi Levy to register with the city clerk in accordance with the provisions of section 11-b of the Domestic Relations Law as fatal to the performance of a valid ceremonial marriage.
Two of the reasons urged in support of the argument of the respondents are untenable for neither the failure to obtain the marriage license nor the failure of the clergyman to register can invalidate the marriage. (Matter of Levy, 168 Misc. 864; Berenson v. Berenson, 198 Misc. 398; Heller v. Heller, 188 Misc. 608.) As Mr. Surrogate Delehanty pointed out in Matter of Levy (supra) the statutory requirements in this connection are addressed to the persons performing the ceremony rather than to the principals and section 25 of the Domestic Relations Law specifically validates such unlicensed ceremonies for it provides: “ Nothing in this article contained shall be construed to render void by reason of a failure to procure a marriage license any marriage solemnized between persons of full age ”.
This leaves for consideration the question of Rabbi Levy’s qualifications to perform a valid marriage. The fact that he was a nonresident did not disqualify him (1921 Atty. Gen. 259; 1911 Atty. Gen. 138) and no proof whatever in support of the charge that he was not an ordained clergyman was offered by the respondents. They argue that his status as such was established only by the testimony of the witness Goldberg who testified that Mr. Levy, now deceased, had acted as a rabbi and had told Mm that he had occupied that position. It is not enough to say, as the respondents do, that the qualifications of the clergyman cannot be established by the bare statement of Ms son-in-law when they have the burden, called in the cases a heavy one, of showing the invalidity of a marriage in the face *399 of proof of the performance of a religious ceremony. (Matter of Dugro, 261 App. Div. 236, affd. 287 N. Y. 595; “ Denton ” v. “ Denton ”, 179 Misc. 681; “ Ferraro ” v. “ Ferraro ”, 192 Misc. 484.) This is especially true where the parties have lived together for a number of years and acknowledged themselves to be husband and wife as was the case here. For the reasons stated, the court holds that the ceremony of August 30, 1945 resulted in the lawful marriage of the deceased and the petitioner.
Having reached this conclusion, the court is confronted next with the question of whether the widow’s attempted exercise of the right of election is barred by the terms of the antenuptial agreement to which she was a party. This agreement was executed on June 18, 1942. It provided for a payment to the petitioner in the sum of $5,000 as a charge against the husband’s estate in place and stead of all rights that as widow the (widow) might otherwise have either as dower in the real estate of the (decedent) or as a distributive share in the personal property of the (decedent) under any statutes now or hereafter, in force and effect.” The petitioner apparently concedes and the respondents insist that this agreement constituted a waiver of any rights that the petitioner might otherwise have had to share as a distributee in the estate of her husband. The petitioner contends, however, that the agreement was drawn with reference to the marriage, and that marriage only, which took place nine days after its execution. She argues that because that marriage was concededly invalid the agreement fell with it and is not now enforcible for the reason that it was not renewed prior to the enactment of the second and valid marriage of the parties.
This court is of the view that the widow must prevail for in the words of Houghton, J. in Hosmer v. Tiffany (115 App. Div. 303, 305) a case remarkably like the present one upon its facts: “ If she could not legally carry out her contract to marry, the consideration for the marriage settlement failed, notwithstanding a ceremonial marriage was had.” Nor is this a novel view of contracts such as that here, entered into in contemplation of marriage where an impediment exists preventing the establishment of a valid marital relationship. An agreement of this sort is turpis contractus, and creates no enforcible rights in favor of either party as against the other (Ford v. De Pontes, 30 Beav. 572, Romilly, M. R.). Or, as Mr. Justice Pecora stated the proposition in Brunel v. Brunel (64 N. Y. S. 2d 295, 297-298) “ If recognition of the marriage offends public policy, then enforcement of the agreement would equally operate in the same manner.”
*400 There can be no question of the fact that the agreement was drawn with reference to the marriage which took place nine days later and because that marriage never took effect neither could the contract based upon it. Nor could the valid marriage between the parties three years later serve to reinstate the original agreement. A wholly different situation confronted the parties then than had obtained at the time they had executed the instrument upon which the executors rely. There had been for one thing a material change for the better in the financial condition of the husband. For a second, there is the fact that the parties were entering into a wholly new relationship. The second marriage did not make the first effective nor speak as of the time when the association had commenced. So as the second-marriage could not and did not validate the first neither could nor did it validate or reinstate the contract.
Neither the doctrine of promissory estoppel nor the line of authority commencing with Ogden v. McHugh (167 Mass. 276) has been disregarded by the court in its consideration of the problem presented in this case. It cannot be said that the silence of the wife at the time of the second marriage induced the husband to believe that she regarded the contract as revived for so far as the record discloses, a mutuality of silence prevailed between the parties and that of the husband cannot be interpreted as cause for the wife to believe that even he was of the view that the unlawful contract had somehow become a proper one. So much for the doctrine of promissory estoppel and its applicability to the facts of this case.
The principles of Ogden v. McHugh (supra) were explained and applied by the Court of Appeals in the opinion by Cardozo, Ch. J. in American Sur. Co. v. Conner (251 N. Y. 1). It supports the view that a conveyance in consideration of marriage is to be upheld even though the marriage is subsequently held void but only when it is impossible to place the parties in the position in which they would have been but for the acts that had been done in the performance of the contract. In the Conner case the husband conveyed to his wife in consideration of marriage, title to real and personal property. The wife later sued for and was successful in obtaining a decree of annulment based upon the husband’s fraud. Thereafter the surety company subrogated to the rights of the husband’s creditors, brought suit against both husband and wife to set aside the conveyance upon the theory that it had been made in fraud of creditors and that there had been a failure of consideration because of the annulment of the marriage. The court in reinstating the judgment at Special Term dismissing the complaint *401 based its holding upon the fact that the consideration passing to the husband from the wife could not be admeasured and hence could not be the subject of the restitution requisite for rescission consisting as it did of ‘ ‘ Grains * * * and losses beyond the process of appraisal. The man had enjoyed the society of a woman, with the opportunity of offspring, who, if born, would have been legitimate (Civ. Prac. Act, § 1135, subd. 4). The woman had given herself to the society of a man, to be associated for the rest of her life with him and with his name in the thought of friends and relatives.” (P. 9.)
It will be seen that the consideration supporting the present invalidated contract was of a wholly different character, the promise on the part of the wife to abstain from asserting her rights as an intestate taker in return for the promise on the part of the husband to charge his estate with the payment of $5,000 establishing an agreement that by its terms had to remain executory until the death of the husband. Neither party was required to surrender present rights and so it could be said that to that extent at least there was no change in their position. There was thus no such intervention of the equities as were present in the Conner case compelling the conclusion there reached for as the court said at page 9 “ The husband suing after annulment to recover what he had parted with on the ground of a failure of consideration, partial or complete, would be subject to the general rule that recovery for failure of consideration is governed by equitable principles (3 Williston, Contracts, §§ 1457, 1530). The decree of annulment destroyed the marriage from the beginning as a source of rights and duties (Matter of Moncrief, 235 N. Y. 390, 397) ”. The present contract on the other hand could not survive the invalid marriage because the court would have had no difficulty, in the language of the opinion of the Chief Judge, in placing “ the parties in the position in which they would have been but for the acts that had been done in performance, of the contract.” Because of the total dissimilarity in the nature of the contracts, the Conner rule cannot be said to be here applicable nor to impose the requirement that the agreement made in contemplation of the voided marriage be upheld.
Having reached the conclusion that the agreement of June 18, 1942 does not bar the widow from asserting her right to an elective share in the estate the question remains as to whether the will provisions for her benefit operate of themselves to produce that result. They do not. In article Third of his will the testator directed the division of his residuary estate into 15 equal parts, five of which were placed in trust for the wife for *402 life, the remaining 10 in five trusts of two shares each for the benefit of the testator’s five children. In article Fourth of the will the testator provided as follows: “ In the event that the income payable to any of my children from the trusts created under paragraph THIRD hereof should in any year be less than Four Thousand ($4000.) Dollars, then and in such event I direct my trustees to pay out of the principal of the trust funds created under paragraph THIRD hereunder and from such of the trust funds as they in their sole and unreviewable discretion may determine, an amount equal to the difference between the total income payable to any of my said children pursuant to said trusts and the sum of Four Thousand ($4000.) Dollars.”
Cleárly the provisions of article Fourth permitting invasion of the principal of the widow’s trust for the benefit of any or all of the testator’s children render the testamentary benefit in her favor inadequate under section 18 of the Decedent Estate Law in light of the rule of Matter of Wittner (301 N. Y. 461). (See, also, Matter of Harris, 136 N. Y. S. 2d 409.) It is not the absence of the probability but the presence of the possibility that the trust for the widow could be completely exhausted for .the benefit of others which makes it as to her illusory. An identical device to comply with the letter but not the spirit of section 18 of the Decedent Estate Law was struck down by the Court of Appeals in the Wittner case and this court is constrained by that action to hold that the widow here is posessed of the right to elect her intestate share and that she has validly exercised it.
Submit decree on notice.