M. Marvin Berger, J.
This case, one of first impression in this State, is concerned with the question of whether a person may be charged with endangering the welfare of a child by active participation in arranging the child’s voidable marriage.
The infrequency of such cases is noted in the annotations at 68 ALR2d 745, to the case of State v Gans (168 Ohio St 174, cert den 359 US 945).
*140 The defendant in this case, Ibrahim Morris Ben Benu, is the father of a 13-year-old girl, who will be referred to hereafter by the fictitious name Fatima. He is charged with endangering her welfare and interfering with custodial authority.
The following facts emerged in the course of a nonjury trial.
Fatima testified that on August 29, 1975, while she was dressed in ordinary street clothing, she was accosted outside her mother’s house by her brother Ibrahim. Fatima, along with five siblings, lived with her mother Mildred Morris, who had been awarded custody of all but the oldest child by a July, 1975, divorce decree of the Supreme Court, Kings County. Ibrahim lived with the defendant and defendant’s wife, Zenaib.
The defendant and his former wife, Mildred Morris, had been separated for some time before the divorce. In a letter dated January 20, 1975, defendant consented to the children of the marriage staying with their mother "because my wife Mildred Benu does not want to be married to a Polygamist, that’s me. But if any of my sons or daughters stay with their mother she must practice Islam according to the dictates and laws of Allah.”
Ibrahim asked Fatima to enter the automobile to visit their father. After a 15-minute conversation, Fatima saw a seventeen-year-old young man of her acquaintance, Richard Springer, also known as Mohammed, approaching. He, too, got into the automobile.
All three drove to the defendant’s apartment. After a short conversation with the defendant, Ibrahim and Springer left the apartment. They returned, left the apartment a second time in the company of the defendant, and returned an hour later with a number of people, among them one Sulaiman el Hadi.
Then, according to Fatima, her father told her she was to be married to Springer and that she would be his "ticket to Paradise.” She was not asked for her consent, she testified. Sulaiman el Hadi read passages from the Koran in Arabic and English and announced that Springer and Fatima were married. The defendant served refreshments. After the collation, defendant gave Fatima $10 and Ibrahim, her brother, drove the couple to Manhattan where they took a bus to Elmira.
Fatima’s mother, Mildred Morris, testified that she had been married to defendant for 22 years. The marriage had *141 been performed by a Baptist minister. She had borne seven children. She identified a separation agreement and the letter concerned with the religious affiliation of the children, a copy of the divorce decree awarding her custody of the children and three Family Court "protection orders.”
Young Ibrahim testified in behalf of the defense that Fatima had told him she was interested in Springer, that she had telephoned Ibrahim several times a day to ask him to bring Springer to the telephone. (Springer sold costume jewelry from a stand outside defendant’s butcher shop in Brooklyn.) Ibrahim finally agreed to arrange for Fatima to elope with Springer. In executing that plan, on August 20, 1975, following a conversation with Fatima, Ibrahim arranged for a rendezvous outside Fatima’s house, following which a marriage ceremony would take place. He said that Fatima kept the appointment but was disturbed that the short notice did not permit her to collect her clothing and luggage.
Ibrahim testified that after delivering his sister to her father’s apartment, he and Springer left the apartment to collect Springer’s belongings from his room. Upon their return, defendant accompanied them to the nearby Yasin mosque, where defendant arranged for el Hadi to return with them to his apartment. Defendant also enlisted the services of Musa Abdul Hakim, as a scribe and witness to the marriage.
Ibrahim testified that both before and after the ceremony, defendant asked Fatima whether she wished to be married. She replied in the affirmative.
Minah Morris, Fatima’s 11-year-old sister, called as a defense witness, recalled that both she and her sister had telephoned their father and brother several times, but Fatima had never asked to speak to Springer. Minah remembered encountering Springer at some gathering at the Yasin mosque but had never seen her sister speak to him.
El Hadi, describing himself as a poet, lecturer, writer and artist, testified that he spent a great deal of time at the Yasin mosque, that he was authorized by a "majlis” or counsel of worshippers, to perform Moslem rites although he was not an imam or Moslem religious leader. He said he had performed numerous marriages, but refused to estimate their number.
(The court takes judicial notice that El Hadi is not enrolled in the City Clerk’s records of those authorized to perform marriages and that no license was issued to Springer and Fatima.)
*142 El Hadi testified that Ben Benu had asked him to perform the marriage rites, that before and after the ceremony, he (El Hadi), had asked Fatima whether she wanted to marry Springer, that the couple had discussed privately the terms of the contract, which was then written out by Musa Abdul Hakim. The document described the groom’s dowry to the bride as a sewing machine. El Hadi denied that a bride price had been promised or paid to defendant by Springer. He said that Fatima had appeared to be of marriageable age.
The defendant testified that he had been aware of Fatima’s interest in Springer; that under the tenets of his faith, matrimony was a desirable alternative to fornication or adultery; that although he had participated in and to some degree had facilitated the performance of the marriage by retaining the services of El Hadi and providing the setting, his role was a passive one. He persisted in that assertion despite testimony that he had expressed concern about his former wife’s reaction to the wedding when she discovered it; that he had questioned Fatima about her desire to marry Springer, and that he had provided money to Fatima to enable her to go to Elmira with Springer.
The defense also offered some letters in Fatima’s writing indicating her interest in Springer.
At the outset, the defendant must be acquitted of custodial interference. The limited period of time which he spent with Fatima makes necessary an acquittal on this count.
The question of endangering a child’s welfare is another matter.
Although the court does not propose to inquire into the validity of the wedding ceremony under Moslem religious law, it is patent that in the light of El Hadi’s lack of authorization to perform a marriage and the failure to obtain a license, the marriage appears to be of doubtful validity, and on this ground, Fatima and Springer were linked, at best, in a voidable relationship. In this connection, the court was not impressed by El Hadi’s assertion that the marriage was conducted in accordance with Moslem ritual. The adoption of Arabic names and costumes by defendant and other witnesses, and the use of Arabic in their rituals and writings do not, per se, validate the marriage under Islamic religious law.
Regardless of conformity or lack of conformity to Moslem ritual, the fact is that Fatima was 13 years old at the time of marriage, and thus, the marriage was voidable.
*143 The public policy of this State is to discourage early marriage, or, at best, to demand that the parents of certain underage children consent to their assuming the responsibilities of matrimony. For, despite reduction of voting age to 18 and the early physical maturity of today’s younger generation, there can be little doubt that children of 13 lack the emotional maturity recognized as a critical factor in a successful marriage.
Defendant asserts that Fatima’s marriage to Springer was not void but voidable. He concedes that "there was some evidence that possibly the defendant consented to the marriage ceremony and by inference did not prevent the ceremony from taking place.”
The defendant is correct in his argument that the marriage was voidable but not void. Section 25 of the Domestic Relations Law provides that a marriage solemnized between minors (a person under the age of 18 — Domestic Relations Law, § 2) is not void for failure to procure a marriage license "where the consent of parent or guardian has been given and such marriage shall be for such cause voidable only as to minors or a minor upon complaint of such minors or minor or of the parent or guardian thereof.”
Defendant points to the fact that neither "the guardian of the minor in this case, to wit, the mother”, nor the minor, has taken steps to annul the marriage. Moreover, in view of the minor’s pregnancy "there will not be any actions to void the marriage.”
The court accepts the authority of the holding in Matturro v Matturro (281 App Div 695), in which the court sustained the validity of a voidable marriage. In that case the husband sought dismissal of his wife’s complaint in a divorce action because the nine-year-old marriage had taken place without her parents’ consent when the wife was under 16. The Appellate Division held that the evidence established the bride’s father’s consent to the marriage, but even if the facts were otherwise, the marriage was voidable, but not void.
The absence of a license may subject the person celebrating the marriage to criminal penalties, but does not invalidate the marriage (Davidson v Ream, 97 Misc 89; Matter of Levy, 168 Misc 864).
"Neither the failure to obtain the marriage license nor the *144 failure of the clergyman to register can invalidate the marriage” (Matter of Lieberman, 6 Misc 2d 396, 398).
But the fact that the marriage was not necessarily invalid is not a defense to the charges herein.
The basic issue is whether the defendant’s activities at or in connection with the performance of the ceremony made him more than an onlooker and whether he knowingly acted in a manner likely to injure his child’s physical, mental and moral welfare.
The court is satisfied beyond a reasonable doubt that the defendant knowingly played an active part in the ceremony. He made his apartment available for that purpose, procured the participation of the person who said he solemnized the marriage and the scribe, provided refreshments, counselled his daughter and provided her with money to leave New York. Although he approved Fatima’s marriage as a desirable alternative to fornication, he went beyond the limits of legally permissible conduct. Certainly, he condoned Ibrahim’s action in transporting Fatima from her residence to his apartment. His actions become even more culpable in the face of the fact that he did not enjoy custody of the child and, by the uncontradicted testimony, he was aware of the likelihood of his divorced wife’s disapproval. Thus, his infraction of the law was performed knowingly.
In the leading case of People v Bergerson (17 NY2d 398) the defendant was convicted of violating section 483 of the Penal Law, from which the present provision, section 260.10 is derived. He helped two 16-year-old boys organize a beer party, ordered a half keg of beer, and transported it to a picnic area, where several teenagers, some under the age of 14, drank the beer. One of the boys was killed by an automobile after leaving the party after 11:00 p.m.
The Court of Appeals, affirming the conviction, said (p 401): “The intent [of § 483] is to protect the physical health, morals and well-being of children, and this solicitude relates not only to sexual offenses but other dangers as well.”
People ex rel. Kwiatkowski v Trenkle (169 Misc 687, 695) states:
"It is true that section 483 * * * includes the word 'wilful,’ yet that does not mean that there must be a specific intent to injure the morals of the child, but that the act is done of *145 defendant’s own will — knowingly and not by mere accident or inadvertence.”
And in People v Caminiti (28 NYS2d 133, 135) in which the defendant brought a female under 16 to a room and occupied it with her, although he claimed he only rented the room to house her after she had been put out of her mother’s home, the court said (Hackett, J.): "There need be no specific intent to so injure or impair the child’s morals; it is enough if the acts were done by the accused knowingly, of his own free will, not by mere accident or inadvertence, and were of a character likely to impair the child’s morals.”
It need not be established that the child’s welfare was actually endangered. The law is directed to the potential for endangering its welfare.
The People concede that Fatima participated in the rites in defendant’s home and did not object to the proceedings. However, even if she were not obviously slow-witted and emotionally underdeveloped, her consent would be irrelevant.
Consent is not a defense to a prosecution under section 260.10 of the Penal Law (People v Gibson, 232 NY 458; People v Ammirati, 42 Misc 2d 797).
In State v Gans (168 Ohio St 174, supra) the defendants, the adoptive parents of an 11-year-old girl, Kay Gans, were charged with acts tending to cause her delinquency. The defendants transported the girl, together with a boy friend, from Ohio to West Virginia, purportedly to attend a football game. In West Virginia, the defendants accompanied Kay to the Morgantown marriage license bureau, where she represented that she was 17, and defendants signed and consented to the issuance of a license. Kay and her boy friend were married in West Virginia and returned to Ohio.
The relevant Ohio statute provides that "No person shall abuse a child or aid, abet, induce, cause, encourage, or contribute to the dependency, neglect or delinquency of a child * * * or act in a way tending to cause delinquency in such child.” (Ohio Rev Code, § 2151.41.)
The Ohio Supreme Court noted that males aged 18 and females aged 16 may be married and that minors — that is, persons under 21 — required consent. The court said in its majority opinion (p 178): "It follows that male persons under the age of 18 years and female persons under the age of 16 years * * * may not be joined in marriage.”
*146 The Legislature of New York, by fixing the age at which minors may not marry without parental consent, as stated in section 25 of the Domestic Relations Law, voiced public policy against marriage of minors.
As many parents of teenagers will attest (tearful comments about the age at which Juliet and Romeo conducted their romance and a host of other references to the maturity of today’s generation notwithstanding), it is a widely held belief that persons of the age of Fatima and Springer lack the awareness of the obligations and responsibilities owed by partners to a marriage to each other, to society, and to their children.
This court adopts unreservedly that portion of the majority opinion in Gans (Matthias, J.) which reads (p 180):
"The court realizes that neither the physiology of man nor some of his more basic instincts have changed much since he first became identifiable as 'homo sapiens.’ It is unquestioned that the 'mating instinct’ per se is and has been throughout the centuries one of such basic instincts, and that throughout the centuries male and female persons have been physically capable of realizing and fulfilling such instinct at an age earlier than that prescribed by the Ohio General Assembly as the minimum age at which two persons may 'be joined in marriage.’
"It is a matter of historic fact, however, that until a comparatively recent date the primary role played in 'marriages’ all over the world by the female person was solely that of consort and childbearer. Here again it is evident that a woman may well be capable of these activities prior to reaching the age of 16. It is also a matter of fact that in many countries of the world today these traditions still persist. It is noted, however, that, as a general rule, whenever and wherever the scope of a 'wife’s’ activity is limited by custom, tradition or law merely to consortium and childbearing, she is looked upon as nothing much more than a chattel — a piece of personal property to be treated and dealt with as such.”
The Gans court also noted that unseasonable marriage interfered with a child’s schooling and that even if Kay’s schooling would not be frustrated by marriage, her knowledge and attitudes would create a chasm between herself and her classmates.
This court must take note of the fact that early marriages, even with parental consent, are more likely than marriage *147 contracted by older persons to lead to divorce and undesirable social consequences.
True, some cases require a finding that the child was declared delinquent before a conviction for contributing to delinquency of a minor could be sustained (Peefer v State, 42 Ohio App 276; Spencer v People, 133 Col 196).
But, as noted above, New York does not require a finding that the child’s welfare was actually endangered before a person can be convicted of endangerment.
The justification of this court’s finding of guilt of the defendant’s endangering the welfare of his child is stated with precision in Gans in the following language (p 183): "Children of tender years tend to be guided more by adult advice and example and by their own unformed emotions than by thought and reflection. The Juvenile Court is concerned more with correction and prevention, if at all possible, than with punishment per se. Thus, although the minor participants in 'child marriages’ are 'more to be pitied than scorned,’ the same attitude does not hold true of adults who participate in effecting such marriages — and it is the opinion of this court that it will behoove all adults, including parents, to discourage such marriages.”
The defendant is found guilty as charged.