## Richmond

M. A. CRAMER, M. G. MURPHY, LARRY C. MOYER, JOHN B. PURCELL, WILLIAM J. RHOADES AND ROY B. SCHERER V. COMMONWEALTH OF VIRGINIA.

March 4, 1974.

Record No. 730336.

Present, All the Justices.

*Theodore David Thelen* (*Robert Pustilnik*, on brief), for plaintiffs in error.

*Vann H. Lefcoe, Assistant Attorney General* (*Andrew P. Miller, Attorney General*, on brief), for defendant in error.

Per Curiam.

Following service on them of a show cause order, and a hearing thereon, the court below rescinded the authority of appellants, M. A.

Cramer, M. G. Murphy, Larry C. Moyer, John B. Purcell, William J. Rhoades and Roy B. Scherer to celebrate the rites of matrimony in Virginia.[1] Appellants appeal this final judgment and petition that we reverse the action of the lower court, declare Code § 20-23 to be null and void, and hold that "any minister providing documentary substantiation of ordination from any organization purporting to be a religious organization be empowered and entitled to celebrate marriages in the Commonwealth of Virginia . . .".

Appellants are all "ordained" ministers of the Universal Life Church, Inc., a California non-profit corporation, with headquarters in Modesto, California. Universal has no traditional doctrine. Its only dogma is that each person believe that which is right and that each person shall judge for himself what is right.[2]

Universal ministers are ordained "without question of their faith, for life for a free-will offering". To be ordained requires little more than an expression of a desire for ordination. An individual wishing to become a minister in Universal may secure his "Credentials of Ministry" from the office in California or he may be "ordained" by any Universal minister. The credential of his ministry is a pocket card. On the face of the card is shown his name and address and a statement that he is ordained by Universal. On the back of his pocket card is the name and address of Universal and a statement that the bearer is a legally ordained minister in the Universal Life Church, Inc.; that the certificate is granted for life and the holder is entitled to perform all ministerial services, such as baptisms, marriages, funerals and conducting church meetings; and that "[t]he holder is entitled to all privileges and considerations usually granted a minister". Universal's fact sheet, and the evidence of witnesses, disclosed the simplicity with which one becomes ordained. No cere-

---

[1] Six other individuals who are not appealing were included in the show cause order and their authority to celebrate the rites of matrimony was also rescinded.

[2] Universal charters local churches "for a free-will offering of $1.00 per month". As a method of communicating "information to our people" the church publishes a newspaper available at $2.00 for one year. According to Universal's information sheet it sells a "beautiful new white and gold Universal Flag" for a "donation of $3.00 or more"; a record album entitled "HOLY SMOKE" and containing "an enlightening sermon by Rev. [Kirby J.] Hensley" for a "free-will offering of only $1.95"; a booklet on Rev. Hensley's life for a "donation", which also entitles one to Hensley's autographed "glossy picture"; a "Doctor of Religious Humanities Degree" for a "free-will offering of $40.00" upon completion of a course of instruction in "American Church Law and Parliamentary Procedure"; an honorary "Doctor of Divinity Degree" to any non-resident of California for a "free-will offering of $20.00" upon completion of a course of 10 lessons; and a "marriage certificate, printed in gold and black" for a "free-will offering of $3.00 each".

mony, oath or form is required—just the card. There is no limit to the number of individuals who could be ordained from the home office of Universal or ordained by its existing ministers. In fact, one could become an ordained Universal minister without his knowledge.

The relationship or communion between a Universal minister and his "congregation" can be characterized as informal, incidental and infrequent. Each of the appellants subscribes to Universal's newspaper, and there is apparently some communication between some of them and the headquarters in Modesto. The amount of time each minister spends with his individual "congregation" varies with the individual and ranges from no time spent some weeks to four to fifteen hours other weeks. The size of the congregation is minimal, sometimes as few as 3, 4 or 5. However, the literature of Universal specifies "[o]ne needs only a Pastor, a Secretary and a Treasurer to have a legal church". The meetings are apparently held when a minister and one or more of his congregation are assembled in their homes, a restaurant or elsewhere, and a discussion is had on any subject.

In the instant case the appellants appeared in the clerk's office of the court below, presented their "ordination card" to the clerk and were routinely processed. That is, they were advised that it was necessary in Virginia for a minister to execute a bond in the penal sum of $500 with surety. Upon the execution of this bond the court entered an order authorizing the applying minister to perform the ceremony of marriage. It was when a reporter from one of the local papers showed up in the clerk's office with a Universal ordination card and requested authorization to perform marriages that the clerk questioned the eligibility of Universal ministers for appointment to perform the ceremony of marriage. The show cause order was then entered against appellants and others.

Code § 20-23 provides, in pertinent part, as follows:

> "When a minister of any religious denomination shall produce before the circuit court . . . proof of his ordination and of his being in regular communion with the religious society of which he is a reputed member . . . such court . . . may make an order authorizing such minister to celebrate the rites of matrimony in this State. . . ."

The Commonwealth contends that the sole issue is whether Code § 20-23 should be construed to apply only to those ministers

to whom the ministry is a full-time vocation. It maintains that the grant of authority contained in this section is intended to be limited to such ministers regardless of the method of their ordination. We reject this argument. It is a matter of common knowledge that there are many ministers in Virginia who serve their congregations with complete fidelity and efficiency while holding outside employment and deriving the major portion of their income from such employment.

We also disagree with the argument of appellants that Code § 20-23 requires the courts of Virginia to enforce a religious test as a prerequisite to appointing ministers to perform marriages in Virginia. This is not to deny the religious background of the section. It can be traced back through the successive Codes of Virginia to an Act of the General Assembly, October, 1784, which read, in part: "It shall and may be lawful for any ordained minister of the gospel in regular communion with any society of Christians, and every such minister is hereby authorized to celebrate the rites of matrimony according to the forms and customs of the church to which he belongs. . . ." Acts 1784, ch. 76. The Act of 1784 also provided for the appointment of ministers in very much the same manner as present-day Code § 20-23. Such appointment was not granted in 1784 to any minister who was an itinerant, or who was not settled within some parish, or with some Christian congregation within the Commonwealth. We do not review the history and politics behind the enactment of the Act of 1784, or the struggle for religious freedom which ultimately resulted in the enactment of the legislation which granted the right to perform marriages to ministers of all faiths.

The statute before us is an Act of the General Assembly of 1962 (Chapter 362) which amended and reenacted Code § 20-23. This case is not one concerning the guarantee of religious freedom as provided in the Constitution, but one of a proper construction of amended Code § 20-23 as an exercise by the General Assembly of its legislative power to delegate the authority to celebrate marriages and to provide licensing requirements for all persons who desire such authority. The interest of the state in the institution of marriage and in prescribing exclusive measures for the creation and dissolution of the marriage relationship was recognized in *Boddie* v. *Connecticut*, 401 U. S. 371, 376 (1971), where it was said:

"It is not surprising, then, that the States have seen fit to oversee many aspects of that institution. Without a prior judicial imprima-

tur, individuals may freely enter into and rescind commercial contracts, for example, but we are unaware of any jurisdiction where private citizens may covenant for or dissolve marriages without state approval."

The interest of the state is not only in marriage as an institution, but in the contract between the parties who marry, and in the proper memorializing of the entry into, and execution of, such a contract. In the proper exercise of its legislative power it can require that the person who performs a marriage ceremony be certified or licensed.

Code § 20-23 is not designed to encourage church marriages or marriage by ministers. The state has no official interest in the place where a marriage occurs, or in the ceremony or ritual which surrounds the act. But it is a fact that the overwhelming majority of the people in this state prefer that their contract of marriage be solemnized, attested and officially reported by a representative of their own religion, faith or religious society. It is also a fact that a majority also prefer that the act of marriage itself occur within their own church or some other religious meeting place.

The state recognizes this preference but is confronted with the necessity that the marriage contract itself be memorialized in writing and by a person of responsibility and integrity and by one possessed of some educational qualifications. Ministers, as a profession, class or group, are persons of integrity and responsibility, and are persons qualified to perform a marriage in a proper manner, execute the necessary forms required by the state, and report the contract of marriage between two people within the time prescribed. Therefore, the General Assembly, through the vehicle of Code § 20-23, makes eligible to perform the ceremony of marriage all ministers who can establish their "ordination" and "communion with the religious society of which they are a member". Neither the word "ordination" nor "communion" is used here in an ecclesiastical sense for the legislature was not concerned with the religious aspect of the marriage ceremony. In *Webster's Third New International Dictionary* (1966 ed.) the word "ordain" has many definitions, including "appoint", "arrange", "order", "manage" or "to establish by appointment", p. 587; and the word "communion" also has many definitions, including "mutual participation", "an interrelation in activity", "joint or common action" or "a function performed jointly", p. 460.

In treating ministers as a class the General Assembly obviously meant to qualify those individuals who, in accordance with the rules,

regulations and discipline of their church, religious sect or organization, had been selected or elected as ministers. In some churches the minister is selected by its ecclesiastical head. The General Assembly assumes that the head of an ecclesiastical order will be a responsible person and will, in turn, act responsibly in the selection of a minister. In other churches ministers are elected or selected by the congregation. Here again the General Assembly assumes that a congregation, the body corporate, will act responsibly and select a proper person as a minister. The same rationale applies when graduates of certain professional, trade or technical schools are licensed to practice their professions or trades without requiring them to be examined or tested by a State Board of Examiners.

The General Assembly was not concerned with preferring one sect over another in the enactment of Code § 20-23. The statute amounts to a blanket qualification of all ministers selected or elected by religious organizations and societies. But such a selection or election must be a considered, deliberate and responsible act. It must be an authoritative act. Ordination is the ultimate in the selection process. The fact that we cannot fit the Universal Life Church, Inc. within any definition of church, religious society or organization, found in any dictionary or in any decided case, is not important to this decision. We recognize the rights of appellants, and others of like inclination, to belong to Universal, to call it a church and to subscribe to its dogma of "believing that which is right as one defines it for himself". That the doctrines or beliefs which Universal employs vary from the orthodox and traditional is no concern of ours.[3]

It is apparent that we have here an organization of ministers—over one million in number says Universal—over one and one-half million says Jeffrey Eugene Kelso, one of appellants' witnesses and a Universal minister.[4] It appears that Universal encourages all who subscribe to its one tenet to become ministers. A church which consists of all ministers, and in which all new converts can become instant ministers, in fact has no "minister" within the contemplation of

[3] The question does suggest itself: Can an organization in which every member decides for himself what is right or wrong, using no yardstick except his own conscience, and without regard to the views, beliefs and convictions of other members, be in fact a religious congregation?

[4] Assuming Kelso's estimate is correct, and the accuracy of Universal's statement that it has over 9,000 churches, this means a proportion of about 166 "ordained" ministers for every one church. Kelso testified he had personally "ordained" approximately 100 persons.

Code § 20-23. The minister referred to there is the head of a religious congregation, society or order. He is set apart as the leader. He is the person elected or selected in accordance with the ritual, bylaws or discipline of the order. By contrast, in Universal every living person is not only eligible for membership, but eligible for immediate ordination into the ministry, with all the benefits of that profession. We do not believe that the General Assembly ever intended to qualify, for licensing to marry, a minister whose title and status could be so casually and cavalierly acquired.

Appellants concede the vital interest of the state in the contract of marriage, for in their brief they say:

"[I]n times of handwritten official records and slow travel, it was important that marriages be performed by honest, literate, and fairly trustworthy people, as clerks of court did not then issue marriage licenses to the parties. . . .

"In short, there was then a real and indeed compelling state interest in controlling minister's celebrations of marriages at the time of the enactment of the bonding and licensing requirements for ministers. . . ."

Appellants then argue that this interest which existed in 1784 has disappeared, and that the state no longer has any interest in controlling who may perform the rite. They labor under a mistaken belief that there is no longer a legal duty on the part of ministers celebrating marriages to return the certificate of marriage to the clerk's office within five days. True, Code § 20-17, which imposed this duty on ministers, was repealed by an Act of the General Assembly in 1968 (Chapter 318). However, Code § 32-353.34 remains in effect. Subsection (c) of that section reads as follows:

"(c) Every person who officiates at a marriage ceremony shall certify to the facts of marriage and file the record in duplicate with the officer who issued the marriage license within five days after the ceremony. In the event said officiant dies, or becomes incapacitated before completing the certificate of marriage, the issuing clerk, upon proof to the court that a marriage was performed, may complete the certificate of marriage, when so ordered by the court."

Therefore the same paramount and compelling state interest which appellants admit existed in 1784 exists today. In fact the importance

of the function to be performed by one who officiates at a marriage ceremony was recently recognized by the 1972 General Assembly when it amended Section (c) of Code § 32-353.34 by adding the second sentence. Acts 1972, ch. 92.

Appellants complain because the court below did not leave a Universal minister licensed and bonded to perform marriages pending their appeal. It is noted that there are other religious societies or organizations which do not have ministers who are appointed, selected or "ordained" within the meaning of Code § 20-23. Accordingly, Code § 20-26 deals with marriage between members of a religious society having no ordained minister as follows:

> "Marriages between persons belonging to any religious society which has no ordained minister, may be solemnized by the persons and in the manner prescribed by and practiced in any such society. One person chosen by the society shall be responsible for completing the certification of marriage in the same manner as a minister or other person authorized to perform marriages; such person chosen by the society for this purpose shall be required to execute a bond under the provisions of § 20-23."

And Code § 20-25 authorizes certain courts of Virginia to appoint one or more persons, resident in the county or city in which such court is held, to celebrate the rites of marriage therein. Such appointment is made in the same manner as Code § 20-23 and the same bond is required of the appointee as that of an ordained minister.

While no case has been cited to us that bears directly on the point in issue here, there are numerous federal cases involving the ministry exemption of the Selective Service Act. In *Dickinson v. United States*, 346 U.S. 389, 394-95 (1953), the Supreme Court had occasion to construe that Act and that part which provided that regularly and duly ordained ministers of religion shall be exempt from training and service. In construing this language the court said:

> "The ministerial exemption, as was pointed out in the Senate Report accompanying the 1948 Act, 'is a narrow one, intended for the leaders of the various religious faiths and not for the members generally.' . . . Certainly all members of a religious organization or sect are not entitled to the exemption by reason of their membership, even though in their belief each is a minister. . . . Each registrant must satisfy the Act's rigid criteria for the exemp-

tion. . . . And since the ministerial exemption is a matter of legislative grace, the selective service registrant bears the burden of clearly establishing a right to the exemption."

In *United States* v. *Phifer*, 440 F. 2d 462 (7th Cir. 1971), the court affirmed a denial of a ministerial exemption to a member of the Watchtower Society although he was recognized by members of his faith as a "duly ordained minister".

These federal cases are distinguishable because they involved the clearly stated congressional intent to limit its grant of exemption to full time ministers. However, the cases do provide an analogy to the intent of the General Assembly in limiting its grant of authority to perform marriages to those who are in fact duly elected or appointed ministers. Those ministers qualifying for appointment under Code § 20-23, like the ministers exempt under the Selective Service Act, are members of a narrow class ". . . intended for the leaders of the various religious faiths and not for the members generally".

The action of the lower court rescinding the authority of appellants to celebrate the rites of matrimony in Virginia is supported by the evidence and is consistent with our construction of Code § 20-23. We have considered all assignments of error made by appellants and find no reversible error in this case.

The judgment of the lower court is

*Affirmed.*