531 So.2d 1193 (1988)
In the MATTER OF the LAST WILL and Testament of Cobert C. BLACKWELL.
Nadine Fortenberry BLACKWELL
v.
Mary Ella B. MAGEE, Executrix, et al.
No. 57927.
Supreme Court of Mississippi.
August 17, 1988.
Rehearing Denied November 2, 1988.
*1194 Thomas J. Lowe, Jr., Jackson, for appellant.
Joseph M. Stinson, Tylertown, for appellee.
En Banc.
ROBERTSON, Justice, for the Court:

I.
At issue this day is whether a minister of the California-based  and not uncontroversial  Universal Life Church (ULC) may in this state solemnize the rites of matrimony so that the persons participating in those rites are legally married. The case turns on whether the Universal Life minister is a "spiritual leader" of a "religious body" within the meaning of our statute law. We hold that the ULC minister was legally empowered and that the purported marriage at issue here was validly effected. The Chancery Court's decision to the contrary is reversed.

II.
In 1984, Cobert C. Blackwell was a 58-year-old widower living in Walthall County, Mississippi. Blackwell and Nadine B. Fortenberry became enamored of one another and on November 8, 1984, the two obtained a marriage license in Walthall County.
The next day, a Friday, our couple set sail for Jackson (of all places) in search of legal blessing for their bliss. They checked into the Holiday Inn Southwest at around 4:00 or 4:30. Blackwell called a Hinds County Justice Court Judge, Jack Bass, and talked to the Judge's wife. Apparently Blackwell requested that the judge come to the motel room and marry them there but was told the judge would only marry people at his office.
Mrs. Bass referred the two to Claude Clark, suggesting that Clark was authorized to perform the marriage. They then contacted Clark who agreed to perform the marriage. On the following morning, Saturday, November 10, 1984, Clark performed the marriage ceremony and signed the marriage license. Shortly thereafter, the newlyweds returned to Walthall County and began living together and holding themselves out as man and wife.
As fate would have it, on February 7, 1985, Cobert Blackwell died. Blackwell left a will which he had executed on July 28, 1980, which devised his real property to his first wife, Margaret (who had predeceased him), for life, remainder to his brothers and sisters in equal parts.[1]
In due course, the will was offered for probate and on February 14, 1985, Mary Ella B. Magee, Blackwell's sister, was appointed executrix and letters testamentary issued. Thereafter, on March 4, 1985, Nadine, the new Mrs. Blackwell, renounced the will, requested a widow's allowance and her share of the estate under the statute of descent and distribution.
Blackwell's brothers and sisters promptly challenged Nadine's rights, claiming that she and Blackwell were not lawfully married because Claude Clark was not a person qualified under state law to perform marriages. Specifically, we are told that the Universal Life Church is not a "religious body" and that Clark is not a "spiritual leader" within the meaning and contemplation of the statute. Miss. Code Ann. § 93-1-17 (1972).
After a hearing, and the submission of briefs of counsel, the Chancery Court on September 15, 1986, ruled that Claude Clark was not a minister fitting within the requirements of Miss. Code Ann. § 93-1-17 (1972). "He is not a minister of the gospel as contemplated by the statute, nor is he a spiritual leader of a religious body. Therefore, the couple was not married and Nadine Blackwell is not his widow." Her petitions were dismissed finally under Rule 54(b), Miss.R.Civ.P., and this appeal has followed.

III.
Whatever its historical, cultural or religious origins, marriage is a function of the *1195 positive enabling laws of the state. Whether a man and woman be married turns upon their compliance with state imposed prerequisites and forms. Pickens v. Pickens, 490 So.2d 872, 875 (Miss. 1986). Where an "i" has been left undotted or a "t" uncrossed, the parties are simply not married, common law marriages having long ago been abolished. Miss. Code Ann. § 93-1-15 (1972).
This state takes no neutral stance regarding marriage, and in this regard we are not unaware of many policy pronouncements which on their face appear of relevance. For example, we find it written more than once that
The law favors marriage, and, when once solemnized according to the forms of law, will not declare its nullity upon anything less than clear and certain testimony, especially after it has been dissolved by the death of one of the parties.
See Whitman v. Whitman, 206 Miss. 838, 843, 41 So.2d 22, 25 (1949); and Powell v. Powell, 27 Miss. 783, 784 (1854). But this begs the question, which is whether the Blackwells' marriage was ever "solemnized according to the forms of law."
Only a select few have been empowered to perform with legal effect rites of matrimony, and we look to our statute law to identify those. Miss. Code Ann. § 93-1-17 (1972). Among those so empowered are "any ... spiritual leader of any ... religious body... ." The Chancery Court held that Claude Clark was not one within the statute and, accordingly, declared the Blackwells' purported marriage void ab initio. Nadine's appeal requires that we carefully examine the point.
Our focus is upon Claude Clark and the Universal Life Church. Clark is, by occupation, a constable of Hinds County, and by religion, a practicing Methodist. His only basis for any claim that he is a person authorized to perform marriages in Mississippi is his "Credentials of Ministry" secured in September of 1984 from the Universal Life Church of Modesto, California.
About two months before he "celebrated the rites of matrimony" between Cobert and Nadine, Clark had written to the ULC inquiring what was required to become one of its ministers. He received in the mail from it a paper entitled "Credentials of Ministry" by which the ULC certified that the bearer was an authorized minister. The space for the name of the bearer was blank, and Clark filled in his name.
The Universal Life Church was established by Kirby J. Hensley, an illiterate Baptist minister from North Carolina. He undertook to educate himself and in the process was influenced by his reading in world religion. Over the years, he conceived the idea of the universal church that would bring people of all religions together instead of separating them.
In 1962, Hensley founded the Universal Life Church having previously opened a "church" in his garage in Modesto, California. Though Hensley had his own ideas about theology, he felt others had a right to their own theories. He began to ordain ministers free, for life, without question. He would present a signed ordination certificate and a one-page information sheet on the ordination merely for the asking. Though ordination was free, a doctor of divinity later cost $20.00, and was offered with ten lessons on how to set up and operate a church.
California, however, enjoined Hensley from issuing a degree from an unaccredited institution, so the Department of Education was moved to Phoenix, Arizona. ULC has since made a not insignificant contribution to federal income tax jurisprudence. See Hall v. Commissioner of Internal Revenue, 729 F.2d 632 (9th Cir.1984); Seward v. United States, 515 F. Supp. 505 (D.Md. 1981); and Universal Life Church, Inc. v. United States, 372 F. Supp. 770 (E.D.Calif. 1974).
Beyond this, Hensley has initiated several "reforms" by marrying a couple in a trial marriage, and marrying two girls at the 1971 Universal Life Church festival. A newspaper, Universal Life, is issued irregularly from the Modesto, California, headquarters. An annual convention is held. Over 16,000 were present in 1971. By 1977, the Universal Life Church claimed to have ordained more than 6,000,000 ministers. *1196 Some 25,000 of those had formed congregations that meet regularly, usually small groups in house-churches.
All in all, ULC is hardly a conventional church by Bible Belt standards.
Constable Clark became a minister of the Universal Life Church in September of 1984. As Clark explained, one of the deciding factors was that the Justice Court Judges had gone on salary and therefore were no longer receiving fees for performing weddings. The judges in Hinds County therefore had discontinued performing weddings away from the office on nights or on weekends.
Clark knew some friends who had credentials of ministry with the Universal Life Church and, as a result, he wrote the church, having previously checked with the Attorney General's office which told him that this would be legal. He also checked with his attorney who gave his approval. He wrote the church a letter, asked them what they required and in return, they sent him the credentials of ministry, an I.D. card. Clark is still a Methodist layman and active in the Methodist church. From his testimony, his religious administrations as a minister of the Universal Life Church were restricted to performing weddings and giving devotions.
According to Clark, the church has no set doctrine per se, but one can worship God in the way that one sees fit and is comfortable with as long as it does not infringe on the rights of others. One is not required to express a belief in God or any deity before he can be a minister of the Universal Life Church. Before becoming a minister, Clark was not required to learn anything about the Universal Life Church or any religious belief that they had.
Clark, at the time of the marriage disputed here, had already performed several marriage ceremonies, a number of them in churches in the Jackson area and the chapel at the Mississippi Agricultural Museum, although it was not clear which of these weddings was performed before and after the wedding in controversy. On cross-examination, he estimated that he had performed twelve to fifteen marriage ceremonies before he conducted this one. The marriage ceremony he used was from the Abington Marriage Manual which he purchased at the Baptist Book Store in Jackson.
We are not unaware that the power of ULC ministers to perform marriage ceremonies has been litigated in at least three other states. New York rejects ULC ministers but under a statute far more restrictive than ours. See Rubino v. City of New York, 125 Misc.2d 936, 480 N.Y.S.2d 971 (1984); and Ravenal v. Ravenal, 72 Misc.2d 100, 338 N.Y.S.2d 324 (1972). Virginia has done likewise. Cramer v. Commonwealth, 214 Va. 561, 202 S.E.2d 911 (1974).
North Carolina originally held a ULC officiated marriage void in the context of a prosecution for bigamy. State v. Lynch, 301 N.C. 479, 272 S.E.2d 349 (1980). The year after the Lynch decision, however, the North Carolina General Assembly passed an act which validated marriages performed by Universal Life Ministers prior to that date, unless they had already been invalidated by a court of competent jurisdiction. This curative statute is codified as N.C.G.S. § 51-1.1 (1984). See Fulton v. Vickery, 73 N.C. App. 382, 326 S.E.2d 354, 356-57 (1985).
The experience in other states in matters such as this is always of value. We find the North Carolina experience particularly intriguing. In the end, however, we are confronted with our own statute ultimate construction of which is our non-delegable duty. We confront this day no imperative that we establish some hard-edged line of demarcation prescribing minimum qualifications for one authorized to solemnize rites of matrimony under Section 93-1-17. Claude Clark is enough of a "spiritual leader", and the Universal Life Church is enough of a "religious body" that, in the eyes of the law of this state, Cobert C. Blackwell and Nadine B. Fortenberry became husband and wife on November 8, 1984, and this is sufficient unto the day.
The judgment of the Chancery Court is reversed and this matter is remanded for *1197 further proceedings not inconsistent with this opinion.
REVERSED AND REMANDED
PRATHER, ANDERSON and ZUCCARO, JJ., concur.
SULLIVAN, J., concurs in result only and specially concurs by separate written opinion.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and GRIFFIN, J., dissent by separate written opinion.
SULLIVAN, Justice, specially concurring:
I concur in the result reached by the majority in this case but would find that Claude Clark meets the requirements of a spiritual leader and that the Universal Life Church meets the requirements of a religious body in the eyes of the laws of this State.
My concern is with the language of the majority that Claude Clark is "enough of a spiritual leader" and that the Universal Life Church is "enough of a religious body." The majority continues its new school of legal interpretation which I prefer to call the "horseshoes school" which began in this State with the landmark decision of Dye v. State, Ex Rel. Hale, 507 So.2d 332 (Miss. 1987).
It is difficult enough for the bench and bar to anticipate and predict future rulings of this Court when we limit ourselves to simple statements of what the law does and does not allow. It is an impossible task when, by the use of "horseshoe jurisprudence," we begin to apply our new "close enough to count" standard as to what is lawful and to what is not. Close counts in horseshoes and hand grenades.
I am "almost persuaded" that the Gartin Justice Building is on the verge of becoming the twentieth century's Tower of Babble.
I concur in the result only.
GRIFFIN, Justice, dissenting:
I respectfully dissent. The majority holds that Claude Clark, an active Methodist layman and Hinds County Constable, is a "spiritual leader" of a "religious body" within the meaning of our marriage statutes. The record reflects that Clark received a blank Certificate of Ministry from the Universal Life Church of Modesto, California; he inserted his name in the certificate; and thereafter considered himself a minister of the gospel, not merely a spiritual leader of a religious body.
He was asked the following question:
Q. Now, during the time after you received your certificate of ministry, of course you consider yourself a minister of the gospel, ordained under rules of this church?
His reply:
A. Yes sir.
The ordination service was without form or substance. It consisted merely of writing for the certificate and filling in the blank. He was then asked the following question:
Q. And at that time, that you performed the ceremony, you of course represented yourself to be a minister of the gospel.
A. Yes sir.
The learned chancellor, in my opinion, properly responded to this evidence. Leaving off some opening and closing personal remarks concerning the attorneys, I quote his opinion extensio:
The only issue to be resolved is whether or not Mr. Blackwell and Mrs. Nadine Fortenberry Blackwell were properly married on November 10, 1984, some three months before his death on February 7, 1985.
The courts of this state have long recognized and followed the rule that marriages are to be favored and they will indulge all reasonable presumptions to that end. Therefore, this marriage should be upheld if proper under the law and evidence.
The court has found the discussion of church and religious organizations interesting; however, this case involves not a test of religious belief, but rather the *1198 qualifications to perform marriages under the statute.
There is no question that Cobert Blackwell and Nadine Fortenberry Blackwell thought that they were married. They went to Jackson for that purpose, and after some difficulty arranged for the ceremony. It was conducted by Mr. Claude Clark, a minister of the Universal Life Church, Inc. Thereafter they began their married life together, and held themselves out in the community as man and wife; unfortunately, Mr. Blackwell died soon thereafter.
If Mrs. Blackwell is the widow of Mr. Blackwell, she is entitled to a portion of his estate; if she is not his widow, she is not entitled to any portion.
The legal issue raised by plaintiffs is whether or not Claude Clark, as a "Minister" of the "Universal Life Church, Inc.," is a person authorized under the provisions of Section 93-1-17, Mississippi Code of 1972, to conduct a marriage ceremony?
That section provides in part the following:
"Any minister of the gospel ordained according to the rules of his church or society, in good standing; ____ or other spiritual leader of any other religious body authorized under the rules of such religious body to solemnize rites of matrimony and being in good standing; ____ may solemnize the rites of matrimony between any persons anywhere within this state who shall produce a license granted as herein directed. ____"
The issue is not whether first, they thought they were married, and held themselves out as man and wife. Nor is the issue, secondly, whether the court agrees with the beliefs, teachings or doctrines of the Universal Life Church, Inc. While the first is important and necessary, and the second can have no influence on this decision, the only issue here is the qualification of the one conducting the ceremony.
What kind of minister is Mr. Clark? Some short while before he conducted the service in question, the Justice Court Judges of Hinds County had determined they would no longer conduct marriage ceremonies outside of the office. Mr. Clark, a constable in that county, seeing a need for someone to conduct these services investigated as to how he might become qualified to do so. He wrote to the Universal Life Church, Inc. of Modesto, California to inquire of its requirements to become a minister. Shortly thereafter, He received by mail credentials on a form with the name left blank. All that was necessary was for him to insert his name, and he was in business. The record reflects that His sole purpose was to become authorized to conduct marriage ceremonies, and nothing in his conduct or activity indicates any intent on his part to be a minister. Someone connected with the church or corporation sent the credentials to him, solely upon the inquiry made. He was a Methodist by religion, active in his church prior to and after receiving his certificate.
In this manner he became a minister. Of What did he become a minister? The Universal Life Church, Inc. of Modesto, California, has no church congregation or building or meeting place for worship or any form of religious observance, presided over or directed by some person, whether or not properly ordained. There is no traditional doctrine except each person is free to decide for himself or herself what is right. The church will ordain anyone without question of faith, doctrine or creed simply upon request, and perhaps a love offering. Each person added to the ranks has a choice of title available, and if "minister" does not satisfy, they may select "king" or any other designation. From the exhibits made a part of the record, and the testimony, this church is unusual, distinctive and controversial, to say the very least. The court recognizes however, that this is not the issue. It must put aside personal feelings and traditional views, and not consider the merits or demerits of this or any other group insofar as religious beliefs are concerned.

*1199 The members of any religion may hold such beliefs as they choose, and the state has no interest therein. But the state does have an interest in who may solemnize the rites of matrimony; and the state has provided by statute those authorized to perform this special and important function.
The question again is whether Mr. Clark, as a minister of the Universal Life Church, Inc., is authorized, under Section 93-1-17, Mississippi Code of 1972 this function?
Three cases from other jurisdictions have been cited as dealing with marriages performed by ministers of this church. They are Cramer v. Commonwealth, [214 Va. 561] 202 S.E.2d 911 (Va. 1974), Ravenall [Ravenal] v. Ravenall [Ravenal], 72 Misc.2d 100, 338 N.Y.S.2d 324 (1972) and State v. Lynch, [301 N.C. 479] 272 S.E.2d 349 (N.C. 1980). It is argued that while these decisions attack the Universal Life Church, they do not undermine the validity of marriages performed to the detriment of a marriage partner who relied in good faith on the authority of the minister. However, the court is of the opinion and so finds that these cases are on point, well reasoned and concurs with the findings therein.
The court is mindful of the situation of respondent and concerned, but even so, it cannot, in equity and good conscience, hold that under the record here, Mr. Clark is qualified or authorized by law to perform the marriage ceremony. The court, after mature and deliberate consideration, is of the opinion that Mr. Clark does not fit within the requirements of Section 93-1-17, Mississippi Code. He is not a minister of the gospel as contemplated by the statute, nor is he a spiritual leader of a religious body.
In view of the finding of the court that the ceremony was not performed by an individual authorized by the law of this state, the parties were not legally married, and she is not his widow.
I believe the chancellor's opinion to be eminently correct and we should not disturb it. Clark made no contention that he was a religious leader and well he could not because, as the record reflects, he had no congregation nor made any effort to form such an assembly. Using his own analysis he received a certificate of a minister in order to fill in for the justice court judges who were at the time only performing weddings during office hours. He makes no contention that he had any authorization from the Methodist Church, his denomination, and well could not have if he truly believed in the ministry of the Rev. Hensley, the founder of the Universal Life Church, who, according to an exhibit in the record, preached "we will come to know that Jesus is the manifestation of the devil working in man today;" and which sermon continues with the statement that there is no supernatural and that God is substance and everything.
As the North Carolina Supreme Court stated, "a marriage pretendedly celebrated before a person not authorized would be a nullity. A ceremony solemnized by a Roman Catholic layman in the mail order business who bought for $10 a certificate giving him the `credentials of ministry' in the Universal Life Church, Inc.  whatever that is  is not a ceremony of marriage to be recognized for the purpose of bigamy prosecution." State v. Lynch, 301 N.C. 479, 272 S.E.2d 349.
Section 93-1-17, Mississippi Code Annotated (Supp. 1987), copied in the chancellor's opinion, tells us who may solemnize marriages, while Section 93-1-15 leaves no doubt concerning the legislative intent that marriages be performed by one authorized to perform marriages. It reads as follows:
(1) No marriage contracted after April 5, 1956 shall be valid unless the contracting parties shall have obtained a marriage license as otherwise required by law, and unless also the marriage, after such license shall have been duly issued therefor, shall have been performed by or before any person, religious society, institution, or organization authorized by sections 93-1-17 and 93-1-19 to solemnize marriages. Failure in any case to comply with both prerequisites aforesaid, which shall also be construed as mandatory and not merely directory, *1200 shall render the purported marriage absolutely void and any children born as a result thereof illegitimate.

(2) Nothing contained in this section shall be construed to affect the validity of any marriage, either ceremonial or common law, contracted prior to April 5, 1956.
This act abolishes common law marriages.
The most casual observer would quickly note that Clark claims to be a minister within a group in whose beliefs he does not subscribe, observing further that his own denomination has not authorized performance of marriage ceremonies by him.
The majority opinion offers a distinction between this case and the Virginia, North Carolina and New York cases relied upon by the chancellor. Admittedly they were before the courts of those states in a different posture. In North Carolina we have a prosecution for bigamy and the Supreme Court of that state held that a marriage performed by one licensed by the Universal Life Church in the exact same manner as Clark would not sustain a conviction for bigamy. State v. Lynch, supra. Both New York and Virginia held that "ministers" of the Universal Life Church did not qualify under the licensing statutes of those states as ministers or religious leaders approved to perform marriages. That, as here, was the sole question before the New York and Virginia courts. The New York decisions come from a trial court in that state, not the highest court, and in Ravenal v. Ravenal, supra, it was held that a marriage performed by a guitarist/folk singer/minister of the Universal Life Church was invalid. The judge there held that the "minister" was neither a clergyman nor a minister and the Universal Life Church was not an ecclesiastical body of a denomination or order within the meaning of the state statute. In Rubino v. City of New York, 125 Misc.2d 936, 480 N.Y.S.2d 971 (1984) (the licensing case), another judge cited Ravenal and affirmed the refusal of the clerk of the City of New York to register Universal Life Church members to perform marriages.
As stated, we agree that our statutes are somewhat different from those of the three states mentioned; however, the decisions there go to the same basic questions regardless of the statutory verbiage, i.e., whether or not these "ministers" of the Universal Life Church are in fact ministers or religious leaders. In Cramer v. Commonwealth, supra, the Supreme Court of Virginia addressed the legislative intent on the questions there, and among other things, said:
... obviously [the legislature] meant to qualify those individuals who, in accordance with the rules, regulations and discipline of their church, religious sect or organization, had been selected or elected as ministers... . The General Assembly assumes that the head of an ecclesiastical order will be a responsible person and will, in turn, act responsibly in the selection of a minister ... (and) that a congregation, the body corporate, will act responsibly and select a proper person as a minister.... (202 S.E.2d 914)
... The statute amounts to a blanket qualification of all ministers selected or elected by religious organizations and societies. But such a selection or election must be a considered, deliberate and responsible act. It must be an authoritative act. Ordination is the ultimate in the selection process.... (202 S.E.2d 915)
It is apparent that we have here an organization of ministers  over one million in number says Universal  over one and one-half million says Jeffery Eugene Kelseo, one of appellant's witnesses and a Universal minister. It appears that Universal encourages all who subscribe to its one tenet to become ministers. A church which consists of all ministers, and in which all new converts can become instant ministers, in fact has no "minister" within the contemplation of code section 20-23. The minister referred to there is the head of a religious congregation, society or order. He is set apart as the leader. He is the person elected or selected in accordance with the ritual, by-laws or discipline of the order. By contrast, in Universal every living *1201 person is not only eligible for membership, but eligible for immediate ordination into the ministry, with all the benefits of that profession. We do not believe that the General Assembly ever intended to qualify, for licensing to marry, a minister whose title and status could be so casually and cavalierly acquired. (Emphasis supplied) (202 S.E.2d 915).[1]
All of us who have a speaking acquaintance with the religious activities within our state well know that there are certain groups or denominations who call all of their members ministers; for example, Jehovah's Witnesses. However, none of these groups make any contention that every member of their congregation is authorized to perform marriages, but leave this function to one selected according to their own rules and customs. Certainly, then, the term spiritual leader of a religious body referred to in the statute has more meaning than the lowest form of membership.
Both the appellant and the appellee agree that the licensing and performing of marriage are traditional matters of state law and that no question concerning First Amendment rights is involved. Maynard v. Hill, 125 U.S. 190, 8 S.Ct. 723, 31 L.Ed. 654 (1888); Butler v. Wilson, 415 U.S. 953, 94 S.Ct. 1479, 39 L.Ed.2d 569 (1974), and numerous other cases, both state and federal.
We are not here inquiring into the validity of any religious doctrine or belief but simply interpreting our state statute, the constitutionality of which is not in question. Therefore, even though we may have sympathy for the appellant, that sympathy need not deter us from doing our duty in carrying out the intent of our state legislature.
It will be argued, I am sure, that we are acting detrimentally to innocent people who, in good faith had one of these alleged ministers to marry them. In reply we point out that by § 93-1-15, supra, both the license and the solemnization are required for a valid marriage.
Common law marriages became invalid after April 5, 1956. All of those desiring to enter into a marriage contract are required to appear before the circuit clerk, obtain a blood test and go through a three-day waiting period before a license may be issued. This procedure is no formality. The law must be complied with and on this we hear no complaints because it effectively eliminated marriage mills from within our borders. We all accept this procedure. Why, then, should it be such a burden for the marrying partners to make some inquiry concerning the credentials of one offering to perform the solemn ceremony. This would take less effort than the obtaining of the license.
Certainly we have some feeling for Mrs. Blackwell, but to allow that feeling to overcome reality would in effect permit every self-appointed minister or those appointed in a dubious fashion as here to perform marriages and completely defeat the purpose of § 93-1-15, supra. In order to enforce the law on occasions someone gets hurt, but it is our duty to see that the practice divulged here is stopped and the law complied with.
If the legislature considers our action harsh, it may as the North Carolina legislature did, validate these marriages up to a certain date provided they are not already invalidated by a court order. North Carolina did not amend its statute, they simply validated the marriages. Those couples *1202 feeling aggrieved by our opinion may, while both are still living, remarry.
I would affirm.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., join this opinion.
NOTES
[1] Apparently Blackwell had seven brothers and sisters, each of whom is named in the will, to-wit: Mescal B. Wood, Inis B. Holmes, Mildred B. Henderson, Blanche B. Johnson, Mary Ella B. Magee, C.L. Blackwell, Jr., and LaRue H. Blackwell.
[1] According to the record, Universal Life Church has fourteen million ministers. This is the lowest rank in the church. It offers seven different doctoral degrees in return for cash from $10 to $100 and the completion of a short test and will confer for $5 donations fifty other special titles including bishop, friar, rabbi, prophet, swami and ascetic gnostic and, I suppose for the more worthy, a sainthood certificate may be obtained for $5. Most attractive is advice on how to fight the Internal Revenue Service.

Further, the secretary for appellee's attorney wrote to Universal Life Church for a minister's certificate. She not only received hers but a supply. Following the power given her by the Universal Life Church, she inserted the names of her two dogs. Are these dogs now "close enough" to being spiritual leaders of a religious body to qualify to perform marriages?