Rae B. Ranieri, Respondent, v Rocco J. Ranieri, Appellant.

Second Department, March 20, 1989

**APPEARANCES OF COUNSEL**

*Shaw, Licitra, Eisenberg, Esernio & Schwartz, P. C. (J. Stanley Shaw, George P. Esernio* and *Andrew D. Greene* of counsel), for appellant.

*Reynolds, Caronia & Gianelli (Peter R. Caronia* and *Lisa R. Smith* of counsel), for respondent.

**OPINION OF THE COURT**

MANGANO, J. P.

The primary question to be resolved on the instant appeal is whether a purported marriage solemnized in the

State of New York by a minister of the Universal Life Church, Inc. (hereinafter the ULC) is void. This question must be answered in the affirmative.

## I

On October 18, 1986, the plaintiff and the defendant were purportedly married by one James J. Corrigan, Jr., a "minister" of the ULC, in a "civil" ceremony performed in Suffolk County. At the time of the marriage, the plaintiff was 40 years old and the defendant was 57 years old. Both parties had been previously married, and those marriages had ended in divorce. On October 17, 1986, the day before the purported marriage, the plaintiff and the defendant executed an antenuptial agreement. In the agreement, the parties agreed, *inter alia,* that each party waived any and all claims and rights which he or she acquired by reason of the marriage. The consideration for this agreement was "the marriage about to be solemnized". By further agreement dated October 17, 1986, the plaintiff and the defendant agreed that the defendant would pay the plaintiff the sum of $90,000 within 90 days of the marriage. The consideration for this agreement was set forth as follows: "WHEREAS, the parties plan to marry and to execute a prenuptial agreement whereby [the plaintiff] will relinquish valuable marital rights that she may have". The parties cohabited after the marriage for a period of 84 days, i.e., until January 10, 1987, when the plaintiff left the marital residence.

## II

In the instant matrimonial action commenced on or about February 10, 1987, the plaintiff alleges three causes of action. The first cause of action is for a judgment of divorce against the defendant based on the defendant's alleged cruel and inhuman treatment of the plaintiff. In a second cause of action, the plaintiff seeks a judgment declaring that the marriage between the parties is "a nullity and void ab initio". In support of this second cause of action, the plaintiff alleges as follows:

"11. On October 18, 1986 plaintiff and defendant were married in a civil ceremony in Bell Terre, County of Suffolk, State of New York by James J. Corrigan, Jr., a 'Minister' of the Universal Life Church, Inc.

"12. Plaintiff married defendant in good faith and with the

genuine belief that said minister was lawfully able to solemnize the marriage of plaintiff and defendant.

"13. Upon information and belief said Universal Life Church minister had no statutory authority to perform a marriage ceremony".

In a third cause of action, the plaintiff seeks recovery of the sum of $90,000 which the defendant had agreed to pay her, pursuant to the antenuptial agreement dated October 17, 1986. The defendant, in his first counterclaim, seeks a judgment declaring that the marriage, the antenuptial agreement, and the agreement to pay the plaintiff $90,000, are void. Specifically, the defendant alleges as follows:

"30. That the plaintiff and defendant were purportedly married in a 'religious' ceremony on the 18th day of October 1986 by a 'Minister' of the Universal Life Church, Inc., whose principal place of business is located at 601 3rd Street, Modesto, California. Said purported marriage ceremony was performed at 56 Old Homestead Road, Port Jefferson, New York. * * *

"32. That a minister of the Universal Life Church does not fall within the statutory definition of clergyman or minister.

"33. The minister who purportedly solemnized the marriage between the plaintiff and the defendant did not have the authority from, or in accordance with, the rules and regulations of the governing ecclesiastical body of any denomination or order nor from any church or synagogue to preside over and direct the spiritual affairs of a church or synagogue.

"34. Universal Life Church, Inc. is not an ecclesiastical body or denomination or order and does not have an actual church or stated meeting place for worship or any form of religious observance. Accordingly the minister who purportedly authorized the marriage between the plaintiff and the defendant was not authorized under Section 11 of the Domestic Relations Law to solemnize said marriage.

"35. The marriage between the plaintiff and the defendant was not valid pursuant to Domestic Relations Law, Section 11 and plaintiff [sic] is entitled to judgment declaring said marriage to be invalid.

"36. On the 17th day of October, 1986, one day prior to the purported marriage between the plaintiff and the defendant, the plaintiff and the defendant entered into an Antenuptual Agreement * * * in contemplation of the purported marriage.

"37. That the sole consideration for the Antenuptual Agree-

ment entered into on the 17th day of October, 1986, was the contemplated marriage between the plaintiff and the defendant, which purportedly took place on the 18th day of October, 1986 by a minister of the Universal Life Church, Inc.

"38. That since the purported marriage on the 18th day of October, 1986 was invalid, no valid marriage as contemplated by the Antenuptial Agreement has taken place.

"39. Since the parties' purported marriage was not valid, the Antenuptual Agreement is null and void and of no force and effect.

"40. That on or about October 17, 1986, in contemplation of the marriage purportedly performed on the 18th day of October, 1986, the defendant executed an alleged Agreement * * * and incident thereto a Promissory Note in the sum of $90,000.00 in favor of the defendant" [sic]. * * *

"42. That the sole consideration for the execution of the aforesaid Agreement and Promissory Note was the contemplated marriage between the plaintiff and the defendant and the execution of an Antenuptual Agreement by the parties * * *.

"43. That since the purported marriage entered into between the plaintiff and the defendant on the 18th day of October, 1986 was not a valid marriage and the Antenuptual Agreement [was] null and void, there was no consideration for the aforesaid Agreement and Promissory Note.

"44. The aforesaid Agreement and Promissory Note executed by the defendant on or about the 17th day of October, 1986, is null and void and of no force and effect".

By notice of motion dated August 18, 1987, the plaintiff moved, *inter alia,* for awards of temporary maintenance in the sum of $1,288 per week, temporary medical, hospital and dental insurance, and interim counsel fees in the sum of $3,500.

By notice of cross motion dated September 21, 1987, the defendant moved for summary judgment on his first counterclaim. In his papers submitted in support of his cross motion, the defendant also opposed the plaintiff's motion for pendente lite relief. In support of his demand for summary judgment on the first counterclaim, the defendant argued that (1) in *Ravenal v Ravenal* (72 Misc 2d 100), it was held that a minister of the ULC was not a "clergyman" or "minister" authorized to solemnize a marriage pursuant to Domestic Relations Law § 11, therefore the instant marriage is void, and (2) the ante-

nuptial agreement, and the agreement to pay the plaintiff the sum of $90,000 are also void. With respect to the plaintiff's motion for pendente lite relief, the defendant argued that, as a matter of law, such relief could not be granted to the plaintiff, since an action for a judgment declaring a marriage void does not come within the statutory definitions of a matrimonial action set forth in Domestic Relations Law § 236 (B) (2) and § 237. In opposition, the plaintiff argued, *inter alia,* that (1) the lack of ecclesiastical authority to perform a marriage ceremony does not affect the validity of a marriage where either or both parties in good faith assumed such authority existed, and (2) in any event, the antenuptial agreements are enforceable. In addition, both parties, in their respective affidavits, addressed the issue of whether the plaintiff was entitled, on the merits, to pendente lite relief.

In the order appealed from the Supreme Court, Suffolk County, disposed of the motion and cross motion, insofar as is relevant to the instant appeal, as follows:

"ORDERED that this motion and cross motion are determined as follows:

"(1) Cross motion for an order granting summary judgment is denied there being a triable issue of fact as to whether the parties knew whether the marriage celebrant had the requisite authority to perform marriages in the State of New York or not and whether they believed themselves to be husband and wife;

"(2) Plaintiff is awarded and defendant is directed to pay the sum of $500.00 per week, pendente lite, for her support and maintenance. The obligation for said payments is retroactive to the date of this application, and shall be sent to plaintiff at the marital residence or such other place she may designate in writing. Furthermore, this obligation shall cease on July 1, 1988 or upon the signing of a divorce judgment, whichever comes sooner. At the expiration of this obligation as aforestated, plaintiff may make application for further support. It appears to the court that plaintiff is engaged in her own business and that this is a marriage of short duration;

"(3) During the pendency of this action, defendant is directed to maintain medical, hospital and dental insurance for plaintiff and shall pay any medical, hospital and dental expenses which are reasonable and necessary, including prescription drugs incurred for treatment rendered to plaintiff during the pendency of this action which are not covered by said insurance.

"(4) Plaintiff is awarded an interim counsel fee in the sum of $1,500.00 with leave to apply to the trial court for additional sums if warranted".

## III

Domestic Relations Law § 11 provides, in pertinent part, as follows:

"§ 11. By whom a marriage must be solemnized

"No marriage shall be valid unless solemnized by either:

"1. A clergyman or minister of any religion * * *

"7. The term 'clergyman' or 'minister' when used in this article, shall include those defined in section two of the religious corporations law".

Religious Corporations Law § 2 provides, in pertinent part, as follows:

"§ 2. Definitions

"An 'incorporated church' is a religious corporation created to enable its members to meet for divine worship or other religious observances.

"An 'unincorporated church' is a congregation, society, or other assemblage of persons who are accustomed to statedly meet for divine worship or other religious observances, without having been incorporated for that purpose.

"The term 'clergyman' and the term 'minister' include a duly authorized pastor, rector, priest, rabbi, and a person having authority from, or in accordance with, the rules and regulations of the governing ecclesiastical body of the denomination or order, if any, to which the church belongs, or otherwise from the church or synagogue to preside over and direct the spiritual affairs of the church or synagogue".

In *Ravenal v Ravenal* (72 Misc 2d 100, 102, *supra*), the Supreme Court, New York County, held that a minister of the ULC lacked the requisite qualification of a "clergyman or minister of any religion" as set forth in Domestic Relations Law § 11. Specifically, the Supreme Court stated *(Ravenal v Ravenal, supra,* at 102-103):

"The following excerpts from a circular entitled 'Information about The Universal Life Church, Inc.', given with a card entitled 'Credentials of Ministry,' certifying to bearer's having been ordained by it, indicate the nature of the organization and its ministry.

" 'Congratulations on becoming a ULC minister, enclosed is

your Credentials of Ministry. Please fill it out. This is your license and ordination paper. One can perform the same services with this license that a minister of any church can perform, i.e., wedding ceremonies, funerals, baptisms, etc. You, as a ULC minister, may ordain other ministers. Simply send us their name and address and we will register them and send their credentials'.

" '1. The ULC has no traditional doctrine. It only believes in that which is right. We believe that everyone has a right to his own conviction and a right to express it. We recognize everyone's belief'.

" '2. The Universal Life Church is a legal organization. It is incorporated in California and filed in many other States and will shortly be filed in All States. We will ordain anyone without question of their faith, for life for a free-will offering'.

" '3. If anyone would like to start a church, we will be happy to furnish them with a charter for a free-will offering of $1.00 per month. The Headquarters of Universal Life Church will keep the records of your church—all you have to do is to report your activities to Headquarters quarterly. When a church is established, they decide on the types of meetings they wish to have. We have no control over the way you conduct your church services. We recognize everyone's belief. One needs only a Pastor, a Secretary, and a Treasurer to have a legal church'.

"It is stated that 'there are now over 1,000,000 ministers' and that: 'Any ULC ordained minister may perform marriage ceremonies—using the ULC marriage certificate—there is no waiting period and county and state licenses are not necessary. Order a marriage certificate today for a free will offering of $3.00 each'.

"Applying the statutory definition of 'clergyman' or 'minister', it is clear that the person purportedly solemnizing this marriage neither had authority from a 'governing ecclesiastical body of the denomination or order' nor 'otherwise from the church or synagogue to preside over and direct the spiritual affairs of the church or synagogue.' Universal Life Church, Inc., is not an ecclesiastical body of denomination or order; indeed, it is entirely nonecclesiastical and nondenominational. Thus, in the absence of an actual church or stated meeting place for worship or any form of religious observance, presided over or directed by a person regarded by such group as its minister, whether or not properly ordained, which would vest

in such person the authority to perform the marriage ceremony, the person here in question, whose authority on this record rests solely on his having obtained in the mail a card entitled 'Credentials of Ministry', must be deemed to be without such authority".

In *Matter of Rubino v City of New York* (125 Misc 2d 936), several ministers of the ULC commenced a proceeding pursuant to CPLR article 78 to compel the Clerk of the City of New York to accept their applications to be registered, pursuant to Domestic Relations Law § 11-b, as persons authorized to perform marriages in the City of New York. The Supreme Court, New York County, held that the Clerk's refusal to register the ministers of the ULC was neither arbitrary nor capricious, stating *(Matter of Rubino v City of New York, supra,* at 937-938): "In *Ravenal v Ravenal* (72 Misc 2d 100), the court determined that a ULC minister had no authority to perform marriages. The respondent was a witness in *Ravenal (supra)* and also brings to the court's attention two cases from the highest courts of the States of Virginia and North Carolina which have determined that ULC ministers are not authorized to perform marriages in those States. Given the strong State interest in protecting the rights and duties derived from marriage *(Maynard v Hill, supra),* and the possibility that those marriages might be declared invalid or annulled (as in *Ravenal v Ravenal, supra),* because a ULC minister performed them, the determination by respondent refusing to register petitioners was not unreasonable. 'If reasonable grounds are present, the court, no matter what its opinion, cannot substitute its own for the administrative determination.' *(Anonymous v Mellon,* 91 Misc 2d 375, 377.)" As noted in *Matter of Rubino v City of New York (supra),* the highest courts of two of our sister States have also held that a marriage performed by a minister of the ULC is invalid. In *State v Lynch* (301 NC 479, 272 SE2d 349), the defendant was convicted of the crime of bigamy. On appeal, the Supreme Court of North Carolina held that the defendant's first marriage, which was performed by a minister of the ULC, was void, since it did not satisfy North Carolina General Statutes § 51-1, which provided that two persons could lawfully marry only in the presence of "an ordained minister of any religious denomination, minister authorized by his church". Therefore, the defendant's second marriage was not bigamous. In its decision, the Supreme Court of North Carolina made the following observations concerning ministers of the ULC *(State v Lynch,* 301 NC 479,

488, 272 SE2d 349, 354-355, *supra*): "A ceremony solemnized by a Roman Catholic layman in the mail order business who bought for $10.00 a mail order certificate giving him 'credentials of minister' in the Universal Life Church, Inc.—whatever that is—is not a ceremony of marriage to be recognized for purpose of a bigamy prosecution in the State of North Carolina". Again, in *Cramer v Commonwealth* (214 Va 561, 202 SE2d 911), six ministers of the ULC commenced a proceeding challenging the State of Virginia's decision to rescind their authority to solemnize marriages in Virginia. The Code of Virginia Annotated § 20-23, provided in pertinent part as follows: "When a minister of any religious denomination shall produce before the circuit court * * * proof of his ordination and of his being in regular communion with the religious society of which he is a reputed member * * * such court * * * may make an order authorizing such minister to celebrate the rites of matrimony in this State". The Supreme Court of Virginia held that ministers of the ULC did not come within the aforenoted statute, for the following reasons:

"In treating ministers as a class the General Assembly obviously meant to qualify those individuals who, in accordance with the rules, regulations and discipline of their church, religious sect or organization, had been selected or elected as ministers. In some churches the minister is selected by its ecclesiastical head. The General Assembly assumes that the head of an ecclesiastical order will be a responsible person and will, in turn, act responsibly in the selection of a minister. In other churches ministers are elected or selected by the congregation. Here again the General Assembly assumes that a congregation, the body corporate, will act responsibly and select a proper person as a minister. * * *

"It is apparent that we have here an organization of ministers—over one million in number says Universal—over one and one-half million says Jeffrey Eugene Kelso, one of the appellants' witnesses and a Universal minister. It appears that Universal encourages all who subscribe to its one tenet to become ministers. A church which consists of all ministers, and in which all new converts can become instant ministers, in fact has no 'minister' within the contemplation of Code § 20-23. The minister referred to there is the head of a religious congregation, society or order. He is set apart as the leader. He is the person elected or selected in accordance with the ritual, bylaws or discipline of the order. By contrast, in Universal every living person is not only eligible for member-

ship, but eligible for immediate ordination into the ministry, with all the benefits of that profession. We do not believe that the General Assembly ever intended to qualify, for licensing to marry, a minister whose title and status could be so casually and cavalierly acquired" *(Cramer v Commonwealth,* 214 Va 561, 565-567, 202 SE2d 911, 914-915, *supra).*

We fully agree with the reasoning of the courts in these cases, and, accordingly, hold that the instant marriage, solemnized in New York by a minister of the ULC, did not satisfy the requirements of Domestic Relations Law § 11 and is void. In so holding, we are well aware of a recent decision by a majority of the Supreme Court of Mississippi *(Matter of Blackwell,* 531 So 2d 1193 [Miss], *rehearing filed* — So 2d — [Aug. 31, 1988]), which held, over a vigorous dissent, that a marriage solemnized in that State by a minister of the ULC was valid. We respectfully decline to follow the holding of the majority of the Supreme Court of Mississippi. Indeed, it must be noted that the majority of the Supreme Court of Mississippi took pains to distinguish *Ravenal v Ravenal (supra),* on the ground that New York's statute was "far more restrictive" than the relevant Mississippi statute *(Matter of Blackwell, supra,* at 196). Moreover, we are of the view that other authorities relied on by the plaintiff do not mandate a contrary result. The plaintiff cites several New York authorities which allegedly stand for the proposition that the lack of authority to perform a marriage ceremony does not affect the validity of the marriage if either or both parties to the marriage ceremony acted in good faith. However, an examination of these cases reveals that they do not stand for the proposition advanced by the plaintiff. In all of the cases cited by the plaintiff, the court either explicitly or implicitly determined that the person solemnizing the marriage did satisfy the requirements of Domestic Relations Law § 11 *(see, Matter of Silverstein,* 190 Misc 745; *Matter of Liberman,* 6 Misc 2d 396, *revd on other grounds* 4 AD2d 512, *affd* 5 NY2d 719; *Shamsee v Shamsee,* 51 AD2d 1028). Rather, the alleged marital impediments which were discounted by the courts in those cases relied on by the plaintiff involved (1) the failure of a rabbi and a muslim qadi to register with the city clerk pursuant to Domestic Relations Law § 11-b *(see, Matter of Liberman, supra; Shamsee v Shamsee, supra),* and (2) the failure of a Judge *(see,* Domestic Relations Law § 11 [3]) to perform the marriage inside of his territorial limitation *(see, Helfond v Helfond,* 53 Misc 2d 974).

## IV

■ Having determined that the instant marriage is void on the ground that it was solemnized by a minister of the ULC who was not authorized to do so under Domestic Relations Law § 11, we now turn to the question of whether the two antenuptial agreements are valid and may be enforced by the plaintiff. This question must be answered in the negative.

As a general proposition, antenuptial agreements "conditioned upon marriage are unenforceable where the marriage is subsequently declared void * * * on the theory that the consideration therefor had failed" (Annotation, *Enforcement of Antenuptual Contract or Settlement Conditioned Upon Marriage, Where Marriage was Subsequently Declared Void,* 46 ALR3d 1403, 1405; *see also, Matter of Liberman, supra; Hosmer v Tiffany,* 115 App Div 303). The New York authorities relied on by the plaintiff are inapposite. In both *Matter of Simms* (26 NY2d 163) and *Matter of Saffer* (39 Misc 2d 691, *affd* 20 AD2d 849), the marriages were incestuous under New York law *(see,* Domestic Relations Law § 5) but the antenuptial agreements were nevertheless enforced on the ground, *inter alia,* that the parties intended that their purported marriages were to be religious marriages conducted by rabbis in accordance with the rites of Jewish law, and their marriages were valid in the eyes of the Jewish faith. The other cases relied on by the plaintiff *(see, American Sur. Co. v Conner,* 251 NY 1; *Matter of Fosbinder,* 2 Lehigh Val L Rptr 270; *Ogden v McHugh,* 167 Mass 276, 45 NE 731), are also distinguishable since they involved situations where it was impossible to place the parties in the position in which they would have been but for the acts that had been done in performance of the agreement *(Ogden v McHugh,* 45 NE 731, 732, *supra; American Sur. Co. v Conner, supra,* at 10). In the case at bar, where the parties were married for only four months before the matrimonial action was commenced, and lived together for less then three months, the parties can clearly be restored to their prenuptial positions even if the antenuptial agreements are held to be unenforceable.

## V

We now turn to the question of temporary maintenance and interim counsel fees.

Domestic Relations Law § 236 provides in pertinent part, as follows:

"§ 236. Special controlling provisions; prior actions or proceedings; new actions or proceedings * * *

"PART B

"NEW ACTIONS OR PROCEEDINGS * * *

"2. Matrimonial actions. Except as provided in subdivision five of this part, the provisions of this part shall be applicable to actions * * * for a declaration of the nullity of a void marriage * * *.

"6. Maintenance. a. * * * in any matrimonial action the court may order temporary maintenance".

Domestic Relations Law § 237 (a) provides:

" § 237. Counsel fees and expenses

"(a) In any action or proceeding brought (1) * * * to declare the nullity of a void marriage * * * the court may direct either spouse * * * to pay such sum or sums of money directly to the attorney of the other spouse to enable that spouse to carry on or defend the action or proceeding".

Domestic Relations Law § 140 specifically allows actions "for judgment declaring nullity of void marriages or annulling voidable marriage[s]" in the following specified situations:

"(a) Former husband or wife living * * *

"(b) Party under age of consent * * *

"(c) Party a mentally retarded person or mentally ill person * * *

"(d) Physical incapacity * * *

"(e) Consent by force, duress or fraud * * *

"(f) Incurable mental illness for five years".

A close scrutiny of the six situations listed in Domestic Relations Law § 140 indicates that they correspond exactly to the substantive provisions contained in Domestic Relations Law §§ 6 and 7 (see, e.g., DeLyra v DeLyra, 141 AD2d 75). Essentially, the defendant argues that the instant action does not constitute an action to declare the nullity of a void marriage since it is based on Domestic Relations Law § 11 and not on Domestic Relations Law § 140 and thus, as a matter of law, temporary maintenance and interim counsel fees cannot be awarded to the plaintiff.

■ We disagree with the defendant's argument.

An action to declare the nullity of a void marriage, as that concept is used in Domestic Relations Law § 236 (B) and § 237,

is not limited to only those types of actions set forth in Domestic Relations Law § 140. Indeed, that concept is broad enough to encompass the plaintiff's second cause of action and the defendant's first counterclaim. As one commentator has stated (Scheinkman, Practice Commentaries, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law C140:1, at 545): "However, even in the absence of a cause of action created by [Domestic Relations Law] § 140, an action to declare the nullity of [a void] marriage surely may be maintained under general declaratory judgment principles".

■ However, the record, including, *inter alia,* the plaintiff's own affidavit submitted in opposition to the defendant's cross motion for summary judgment and her statement of net worth, indicates that (1) the parties cohabited for a very short time (2) the plaintiff owns and operates her own business, i.e., a beauty salon, in Coram, New York, and has maintained her own residence in Rocky Point, New York, and (3) she has already paid her counsel the sum of $3,500. Under the circumstances, her requests for temporary maintenance, medical and dental benefits and interim counsel fees should have been denied on the merits (Domestic Relations Law § 236 [B] [6] [a]; *Fagelbaum v Fagelbaum,* 115 AD2d 454; *Rodgers v Rodgers,* 98 AD2d 386; *Ackerman v Ackerman,* 96 AD2d 543; *Gruber v Gruber,* 43 AD2d 917; *cf., Zerilli v Zerilli,* 110 AD2d 634).

## VI

In conclusion, the purported marriage between the parties is void since it was solemnized by a minister of the ULC who was not authorized to do so pursuant to Domestic Relations Law § 11. The antenuptial agreements entered into by the parties are therefore unenforceable. Finally, on the merits, the plaintiff is not entitled to temporary maintenance, and medical, hospital or dental insurance or expenses, or interim counsel fees.

Accordingly, the order should be reversed insofar as appealed from, on the law, and in the exercise of discretion, the defendant's cross motion granted, and those branches of the plaintiff's motion which were for maintenance, medical, hospital and dental insurance, and medical, hospital or dental expenses not covered by insurance, and interim counsel fees denied.

BRACKEN, KUNZEMAN and BALLETTA, JJ., concur.

Ordered that the order is reversed insofar as appealed from,

on the law, and in the exercise of discretion, without costs or disbursements, the defendant's cross motion for summary judgment on his first counterclaim is granted, the parties' purported marriage and the two antenuptial agreements, both dated October 17, 1986, are declared void, the complaint and the defendant's second and third counterclaims for an annulment and a divorce, respectively, are dismissed, the defendant's fourth, fifth and sixth counterclaims are severed, and those branches of the plaintiff's motion which were for temporary maintenance, medical, hospital and dental insurance, and medical hospital and dental expenses not covered by insurance, and interim counsel fees are denied, and it is further,

Ordered that the matter is remitted to the Supreme Court, Suffolk County, for (1) a determination with respect to the respective rights of the parties in any separate or marital property, and with respect to permanent maintenance and counsel fees to be awarded, if any, and (2) the entry of an appropriate judgment.